IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MICHAEL SIMMONS, | : | CIVIL ACTION NO. 3:15-cv-00317-SRU |
| individually and on behalf of all others | : | |
| similarly situated, | : | |
| | : | |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| CHARTER COMMUNICATIONS, INC., | : | |
| | : | |
| Defendant. | : | NOVEMBER 20, 2015 |

**MEMORANDUM IN SUPPORT OF**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Summary judgment is proper on Plaintiff Michael Simmons's sole remaining claim that Charter Communications, Inc. ("Charter") violated the Do-Not-Call ("DNC") provisions of the Telephone Consumer Protection Act ("TCPA"), because Charter's multi-prong policy for complying with the DNC provisions brings Charter within the TCPA's statutory "safe harbor."

The TCPA's "safe harbor" provides that if a company making telemarketing calls takes reasonable care to avoid calling phone numbers on the national DNC list, the company is not liable for violating the TCPA's DNC provisions—even if it inadvertently calls a phone number on the national DNC list on occasion. *See* 47 U.S.C. § 227(c)(5)(C). Rather, reasonable, good faith efforts to comply with the DNC rules are all the statute and its implementing regulations require. *See id.*; *see also* 47 C.F.R. § 64.1200(d) (providing six indicia of reasonableness); 47 C.F.R. § 64.1200(c)(2)(i) (providing five similar requirements for the safe harbor to apply).

Discovery has established that Charter plainly falls within this safe harbor. Charter has a robust DNC policy in which phone numbers that Charter wishes to call are repeatedly "scrubbed" in a timely manner against DNC lists maintained by the FCC's preferred DNC vendor.

**ORAL ARGUMENT REQUESTED**

There can be no dispute that Charter's policy was in effect when Charter called Mr. Simmons. The only reason Mr. Simmons received calls from Charter (four calls in total) was because Charter mistakenly thought that Mr. Simmons was a Charter customer when it called him such that one of the exceptions to the TCPA's DNC rules—the so-called "established business relationship" or "EBR" exception—applied. *See* 47 C.F.R. § 64.1200(f)(14)(ii). Once Mr. Simmons informed Charter that he no longer wished to receive phone calls from Charter, the calls promptly ceased.

This is precisely the scenario in which a defendant falls within the TCPA's safe harbor. *See* 47 U.S.C. § 227(c)(5)(C). Accordingly, summary judgment should be entered in Charter's favor on Plaintiff's remaining claim.

## BACKGROUND

### *Procedural History*

This is Plaintiff's counsel's second lawsuit against Charter in this Court for alleged violations of the TCPA. Plaintiff's counsel first filed *Schnetzler v. Charter Communications, Inc.*, No. 3:14-cv-01360-MPS (D. Conn., filed Sept. 19, 2014) (Shea, J.), alleging that Charter used an autodialer to market Charter's business services to cell phones. Charter explained that the claim was baseless and sought expedited discovery on the autodialer issue, and the plaintiff dismissed her case shortly before the end of that targeted discovery. *See* Stip. of Dismissal, *Schnetzler* (D. Conn. Apr. 10, 2015), ECF No. 39.

Shortly before dismissing *Schnetzler*, Plaintiff's counsel filed this case, now focusing on Charter's telemarketing of residential services. As in *Schnetzler*, Plaintiff again alleged the use of an autodialer to call a plaintiff's cell phone. Charter again explained that this claim was baseless, and again sought expedited discovery on this issue. This Court, like Judge Shea,

ordered expedited, focused discovery over Plaintiff's objection. *See* Conference Mem. & Order, ECF No. 26. Discovery once again revealed that Plaintiff's allegations were meritless, and this forced Plaintiff to dismiss his autodialer claim with prejudice. *See* Stip. of Partial Dismissal, ECF No. 36.

Unlike *Schnetzler*, this case also contains a second count alleging that Charter violated the TCPA by calling Mr. Simmons even though he is on the national DNC registry. *See* Compl. ¶¶ 38-47, ECF No. 1 (Count II). Since the outset of this case, Charter has explained that this claim, too, will fail because Charter has a multi-tiered process to comply with DNC requirements such that Charter falls within the TCPA's statutory "safe harbor." The parties have now completed expedited discovery on Charter's DNC policies, and Charter seeks the entry of summary judgment in its favor on Count II.

*Factual Background*

Charter has a customer named ▮▮▮▮ Simmons. Statement of Undisputed Material Facts ("SUMF") ¶ 1. Charter sought to contact Ms. Simmons—who subscribed to Charter internet—to offer her Charter additional services. *See id.* ¶ 2. The phone number Ms. Simmons had provided for her account was no longer functioning, so Charter engaged a vendor to find the correct phone number for Ms. Simmons. *Id.* ¶¶ 3-4. The vendor mistakenly associated the phone number of Plaintiff Mr. Simmons with Charter customer Ms. Simmons, and Charter's customer records were updated accordingly. *Id.* ¶ 4.[1]

Because Charter believed that Mr. Simmons's phone number was the phone number for existing customer Ms. Simmons, a party which Charter was lawfully permitted to contact,

---

[1] Although this process is typically reliable and successfully updates phone numbers for customers, there are rare circumstances, like in this case, where an incorrect phone number is attributed to a Charter customer. Rarer still is the situation where the incorrect phone number was also on a DNC list. Identifying other instances where a phone number was both incorrectly attributed to a Charter customer and on a DNC list is a highly-individualized process.

3

Charter sought to contact that phone number. But under Charter's policies, the phone number could not be contacted until after Charter ran numerous checks on the phone number in order to ensure its compliance with state and federal law.

Charter first sent the number to PossibleNOW, a leading vendor providing DNC services. SUMF ¶ 5A. In fact, PossibleNOW is the FCC's own preferred vendor for providing DNC services. *Id.* ¶ 7A. PossibleNOW provides a variety of services to Charter to ensure compliance with the TCPA. *See id.* ¶ 7B; *see also* Ex. E (CHTR_00018) (describing services that ensure compliance with DNC rules, existing business relationship exceptions, and restrictions on calling wireless telephone numbers).[2]

Among other things, PossibleNOW uses "all commercially reasonable, professional and customary methods to ensure that it obtains the correct and updated DO NOT CALL DATA from various applicable entities." SUMF ¶ 10; Ex. F (CHTR_00019-28) at CHTR_00022. PossibleNOW also "scrubs" phone numbers that Charter wishes to contact against the federal and state DNC registries. SUMF ¶ 7. Charter also maintains a company-specific DNC list, *id.* ¶ 16, and checks phone numbers against that list as well, *id.* ¶ 12B.

If a phone number is on the Charter-specific DNC list, it is not dialed under any circumstances. *Id.* ¶ 18; *see also* 47 C.F.R. § 64.1200(a)(1)(iv), (d)(6); Ex. D (McRoberts Dep.) at 69:3-9 ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"); Ex. A (Link Dep.) at 38:15-19 ("Q. Now, just looking at how those parts relate to each other, if that number had been on the internal do-not-call list, would it have been called? A. No, sir.").

---

[2] All exhibits referenced herein are to the exhibits filed with Charter's Statement of Undisputed Facts unless otherwise noted.

4

If a phone number is on a federal or state DNC registry (but not on the Charter-specific DNC list), the phone number can be called if there is an "existing business relationship" (or "EBR") between the parties as a matter of law (though the precise parameters of what constitutes an EBR vary from state-to-state).  SUMF ¶¶ 14-15; *see also* 47 C.F.R. § 64.1200(f)(5), (14); *Missouri ex rel. Nixon v. Progressive Bus. Publ'ns, Inc.*, 504 F. Supp. 2d 699, 705-06 (W.D. Mo. 2007) (explaining that calls do not violate DNC registry rules if caller and recipient have or have had an EBR).

Once PossibleNOW confirms that a phone number may be called (either because it is not on a DNC list, or because it is on a DNC list but subject to the EBR rule), Charter then sends the phone number to a different vendor for calling.  The relevant vendor here is Empereon Marketing ("Empereon").  *See* SUMF ¶ 19.  Empereon is required to conduct additional scrubbing to double-check phone numbers against all relevant DNC lists to ensure that they may be called before calling them.  *See id.* ¶ 22 (explaining that Empereon "double-check[s] everything" before making any calls (citation omitted)); *id.* ¶¶ 20-21 (explaining that vendors like Empereon are required to scrub all the numbers a second time).

The DNC "scrubs" that Empereon must conduct on Charter's behalf before making calls on Charter's behalf are set forth in the Master Services Agreement between Charter and Empereon:





*See id.* ¶ 20 (citation omitted).[3]

Empereon trains its employees to ensure that they comply with all applicable DNC rules and regulations. *See* SUMF ¶ 23 (telemarketers "go through a training class, and that is part of their training, how to handle Do Not Calls" (citation omitted)); *id.* ¶ 24 (training continues throughout the agent's employment through additional online training "every sixth months" (citation omitted)); *see also* Ex. N (CHTR_00017); Ex. O (CHTR_00013-16). All Empereon employees must sign an agreement explaining that they understand and will abide by the DNC policy. *See* SUMF ¶ 24 (citations omitted).

Only after this multi-tiered process is completed may a phone number then be called.

Mr. Simmons's phone number went through that multi-tiered process and was identified as a number that could be called even though it was on the national DNC list because his phone number was associated with a current Charter customer, Ms. Simmons, and thus Charter believed that it had an EBR with Mr. Simmons. SUMF ¶ 25; Ex. A (Link Dep.) at 37:17-25 ("PossibleNOW returned back the status of that number being on a federal do-not-call list but

---

[3] The requirements also include keeping various records for a period of five years, including records of telephone numbers called during telemarketing campaigns, the results of scrubs against state and federal DNC lists, and records of requests made by consumers not to receive calls from Charter. *See* SUMF ¶ 21 (citation omitted).

also the status that customer had an existing business relationship with Charter. So that designation, in the absence of them on Charter's private do-not-call, which they were not, allows us to dial that phone number."); Ex. D (McRoberts Dep.) at 101:11-19 ("■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■").

As part of a campaign directed towards existing customers like Ms. Simmons, Mr. Simmons received four telephone calls on behalf of Charter. *See* SUMF ¶ 26. He also placed one call to Charter in January 2015, for a total of five calls between the parties. *See id.*

- The first call, on January 9, 2015, lasted approximately 15 seconds. *Id.* ¶ 27. The Empereon representative introduced himself as calling on behalf of Charter, Mr. Simmons responded with a vulgar expletive and hung up the phone. *Id.* ¶ 28.

- The second call was initiated by Mr. Simmons to Charter (and answered by an Empereon employee) the same day. *Id.* ¶ 29. That call lasted approximately one minute. *Id.* ¶ 30. When Charter explained that the telephone call was being recorded, Mr. Simmons interrupted the conversation to state that he did not want to be recorded. *Id.* ¶¶ 30-31. Charter explained that if Mr. Simmons did not want to be recorded, Charter would terminate the call. *Id.* ¶ 31. Mr. Simmons again responded with a vulgar expletive and the call ended. *Id.*

- The third and fourth calls were on January 15 and 19, and both resulted in an answering machine picking up the calls. *Id.* ¶ 32. Charter did not leave a message for Mr. Simmons. *Id.* ¶ 33.

- Mr. Simmons answered the fifth call, on January 20, and for the first time informed the agent that he did not want to receive any more phone calls from Charter. *Id.* ¶¶ 34-35.

Mr. Simmons did not receive any further calls from Charter after he stated that he did not wish to receive calls from Charter. *Id.* ¶ 37. Mr. Simmons has admitted that he has not suffered any harm or damages from these phone calls. *Id.* ¶¶ 38-39.

**ARGUMENT**

The only remaining claim in this case is that Charter allegedly violated the TCPA by calling Mr. Simmons despite the fact that he is on the national DNC registry. But the TCPA

7

does not penalize companies that make reasonable efforts to prevent calling phone numbers on the DNC registry.  Rather, the TCPA sets forth a statutory safe harbor for companies, like Charter, that make reasonable efforts to minimize the number of phone calls that are inadvertently placed to phone numbers on the national DNC registry.  *See* 47 U.S.C. § 227(c)(5)(C).  Discovery has established that Charter falls squarely within this statutory safe harbor, and Charter is entitled to summary judgment on Mr. Simmons's only remaining claim.

### *Legal Standard*

Summary judgment is appropriate when the evidence demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  There are no genuine issues of material fact and Charter is entitled to judgment as a matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 327 (1986).

### *The TCPA's Safe Harbor*

The TCPA and its implementing regulations provide a safe harbor for companies that make a good faith attempt to avoid placing phone calls to phone numbers on the national DNC registry.  According to 47 U.S.C. § 227(c)(5)(C), "[i]t shall be an affirmative defense in any action brought under this paragraph that the defendant has established and implemented, with due care, reasonable practices and procedures to effectively prevent telephone solicitations in violation of the regulations prescribed under this subsection."  "If a company is complying in a reasonable manner with the requirements of the safe harbor, any true error should be excused."  Telemarketing Sales Rule, 60 Fed. Reg. 43842, 43855 (Aug. 23, 1995).

The implementing regulations sets forth six hallmarks for the safe harbor to apply: (1) maintain a DNC list and written policy for abiding by the same; (2) train personnel engaged

in telemarketing; (3) track DNC requests; (4) identify callers as sellers or telemarketers; (5) apply DNC requests to the appropriate entity; and (6) maintain records of consumers' requests not to receive further communications. *See* 47 C.F.R. § 64.1200(d); *see also id.* at § 64.1200(c)(2)(i) (providing similar requirements for the good faith defense to apply, including (a) having written procedures to comply with DNC rules, (b) training personnel on DNC procedures, (c) maintaining a record of DNC requests, (d) accessing the national DNC database, and (e) purchasing the national DNC database). Charter satisfies each of these requirements.

### *Charter Falls Within The Statutory Safe Harbor*

Charter took reasonable precautions to avoid violations of DNC regulations and thus falls within the statutory safe harbor. *See* 47 U.S.C. § 227(c)(5)(C). Each of the elements of the safe harbor has been established here. *See* 47 C.F.R. § 64.1200(d), (c)(2)(i).

*First*, Charter has written policies for maintaining a DNC list. *See* SUMF ¶ 6; 47 C.F.R. § 64.1200(d)(1), (c)(2)(i)(A). Charter has written contracts with PossibleNOW, the industry-standard vendor for DNC list maintenance. *See* SUMF ¶ 7. PossibleNOW is "the FCC's vendor for the federal do-not-call list, so [Charter has good reason to] trust that they have the best, most up-to-date knowledge of every state, because they do support the FCC, as well." *See id.* (citation omitted). Among other things:

- PossibleNOW uses "all commercially reasonable, professional and customary methods to ensure that it obtains the correct and updated DO NOT CALL DATA from various applicable entities." *See* SUMF ¶ 10 (quoting Ex. F (CHTR_00019-28) at CHTR_00022).

- Charter subscribes to numerous PossibleNOW services, including "DNCall"— a service "allowing companies to scrub leads against all pertinent do not call lists (including all state, federal, and wireless do not call lists)." *See* SUMF ¶ 7; *see also* Ex. E (CHTR_00018) (letter explaining DNCall service).

- All phone numbers that Charter seeks to use in any telemarketing campaign are "scrubbed" against PossibleNOW's databases. *See* SUMF ¶ 8; *see also* Ex. C (Shaar-

9

>Wildman Dep.) at 72:10-16 ("We need to scrub against the National Do-Not-Call List, the state do-not-call.").

Charter also has its own DNC list which it regularly updates and maintains.  *See id.* ¶¶ 16-17.

Charter has a second set of written policies for ensuring DNC compliance for calls made on Charter's behalf: where, as here, Charter itself does not place the phone calls, Charter requires—in writing—its vendors to take numerous additional steps to ensure compliance with the DNC lists.[4]  The phone calls at issue here were placed on Charter's behalf by Empereon. SUMF ¶¶ 19, 26.  Charter has a written agreement with Empereon that provides, among other things, that:

- Phone numbers that are on applicable DNC lists must be removed from any calling campaign;

- If a call recipient requests to be placed on a company-specific DNC list, that phone number may not be called;

- The applicable DNC lists must be checked "prior to initiating any telephone phone call . . . on behalf of Charter and at least every 30 days thereafter or more often if required by state or federal law";

- Company-specific DNC lists must be checked before placing any phone calls and calls may not be placed to any phone number on such a list; and

- "Charter's account with PossibleNOW" must be used "for the receipt of the Do-Not-Call lists and the delivery of call logs."

*See* SUMF ¶ 20; *see also* Ex. L (CHTR_00003-12) (Empereon Master Outbound Telemarketing Agreement).  This process of scrubbing and checking phone numbers to be called on Charter's behalf against the DNC lists is in addition to Charter's own scrubbing of phone numbers via PossibleNOW before the numbers are sent to Empereon.  Empereon itself also maintains its own

---

[4] Where Charter itself places phone calls (as opposed to a vendor placing calls on Charter's behalf), it has yet another set of written DNC procedures as well.

internal written procedures memorializing its own DNC policies.  *See* SUMF ¶¶ 23-24; *see also* Ex. O (CHTR_00013-16) (Empereon's "Do-Not-Call" Policy).

*Second*, the personnel engaged in making the calls on behalf of Charter are trained on applicable DNC rules and regulations.  *See* SUMF ¶¶ 23-24; 47 C.F.R. § 64.1200(d)(2), (c)(2)(i)(B).  The personnel calling on Charter's behalf "go through a training class, and that is part of their training, how to handle Do Not Calls."  SUMF ¶ 23 (citation omitted); *see also id.* ¶ 24 (explaining that the training continues throughout the agent's employment through additional online training "every sixth months" (citation omitted)); Ex. M (Simmons Empereon 0001-59) (Empereon training materials) at Simmons Empereon 0038; Ex. O (CHTR_00013-16) (Empereon's "Do-Not-Call" Policy) (including, among other things, information on what to say when a customer requests to be taken off the list and instructions for completing those requests).  Empereon personnel are required to review and sign a written policy affirming that they understand the steps required to comply with federal regulations.  *See* Ex. N (CHTR_00017) (Empereon's Do Not Call Procedure and Action for Non-Compliance: Sales Professionals).

*Third*, Charter maintains in-house records of telephone numbers that telemarketers may not contact, it has procedures for adding numbers to Charter's internal DNC list when consumers so ask, and it purchases and accesses the national DNC list regularly.  *See* SUMF ¶¶ 6-18; 47 C.F.R. § 64.1200(d)(3), (d)(6), (c)(2)(i)(C)-(E).  Charter uses PossibleNOW to scrub the federal and state DNC lists against Charter's call lists.  SUMF ¶ 7.  Because Charter uses a vendor, it also has written verification that the vendor purchases, downloads, and scrubs against national and state DNC lists.  *See* Ex. L (CHTR_00003-12) (Master Outbound Telemarketing Agreement); Ex. D (McRoberts Dep.) at 135:15-18 (███████████████████████████████████████████████████████████████████); *id.*

11

at 106:25-107:3 ("We maintain the Do Not Call lists for every client and upload their specific Do Not Calls generally).

*Fourth*, the Charter call representatives plainly identified themselves as such, as their training requires. *See* 47 C.F.R. § 64.1200(d)(4). For example, on the first call placed to Mr. Simmons, the Charter representative initiated the call as follows: "Hello, hi my name is ▮▮▮▮▮▮, and I'm a products specialist with Charter Communications." *See* SUMF ¶ 28 (citation omitted). And at the start of the call Mr. Simmons placed to Charter, the Charter representative similarly identified himself. *See id.* ¶ 31 ("This is ▮▮▮▮▮ at Charter Communications." (citation omitted)); *see also* Ex. D (McRoberts Dep.) at 40:5-10 ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮").

*Fifth*, when Mr. Simmons requested that he no longer receive calls from Charter, the DNC request was promptly added to the Charter DNC list. *See* SUMF ¶ 36; 47 C.F.R. § 64.1200(d)(5); *see also* Ex. C (Shaar-Wildman Dep.) at 111:23-112:3 ("Q. To be clear, did [PossibleNOW] explain when the ▮▮▮ number went on the Charter internal do-not-call list? A. Yes, I believe it was January 24th, 2015."). Indeed, after Mr. Simmons told Charter that he did not wish to receive further calls, he never again received a call from Charter or Empereon on behalf of Charter. *See* SUMF ¶ 37; *see also* Ex. C (Shaar-Wildman Dep.) at 119:9-10 ("[T]he last call made to that customer was on January 20th, 2015.").

*Sixth*, and finally, Charter requires telemarketers making calls on its behalf to maintain records of DNC requests for five years. SUMF ¶ 21 (citation omitted); 47 C.F.R. § 64.1200(d)(6). For example, Charter's contract with Empereon requires Empereon to keep "records of requests made by consumers to Telemarketer not to receive telemarketing calls made

12

on behalf of Charter, including phone number and date and time of request" and make these available to Charter.  SUMF ¶ 21; *see also* Ex. L (CHTR_00003-12) at CHTR_00008-9.  In addition, Empereon must also keep records of all numbers called during telemarketing campaigns, the results of scrubs performed on campaign lists, copies of all call lists, and other records intended to ensure Empereon and Charter's compliance with various DNC rules and regulations.  *See* SUMF ¶ 21; Ex. D (McRoberts Dep.) at 106:25-107:3 ("███████████████████████████████████████████████████████████").

The key point is that Charter falls within the TCPA's safe harbor provision for companies that make reasonable, good faith efforts to comply with the DNC rules.  *See* 47 U.S.C. § 227(c)(5)(C); 47 C.F.R. § 64.1200(d), (c)(2)(i).  The documents produced by Charter, Empereon, and PossibleNOW and the deposition testimony of both Charter and Empereon's 30(b)(6) representatives unequivocally show that Charter "'institute[d] procedures for maintaining a list of persons who request not to receive telemarketing calls,' made by or on their behalf." *Hamilton v. Spurling*, No. 3:11cv00102, 2013 WL 1164336, at *12 (S.D. Ohio Mar. 20, 2013), and Charter is therefore entitled to summary judgment.

## CONCLUSION

For these reasons, Charter requests that the Court grant summary judgment in Charter's favor.

Dated:  November 20, 2015                                  Respectfully submitted,

                                                    By:  */s/ Rory M. Farrell*

David E. Rosengren (ct05629)
Rory M. Farrell (ct29655)
MCELROY, DEUTSCH, MULVANEY
& CARPENTER, LLP
One State Street, 14th Floor
Hartford, CT  06103
Telephone: (860) 241-2693
Facsimile: (860) 522-2796
drosengren@mdmc-law.com
rfarrell@mdmc-law.com

Jeffrey S. Powell (phv07106)
Ragan N. Naresh (phv07105)
Kathleen A. Brogan (phv07107)
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C.  20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200
jpowell@kirkland.com
ragan.naresh@kirkland.com
kathleen.brogan@kirkland.com

*Attorneys for Defendant*
*Charter Communications, Inc.*

## CERTIFICATE OF SERVICE

I certify that on November 20, 2015, a copy of the foregoing document was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the notice of electronic filing. Parties may access this filing through the court's CM/ECF system.

*/s/ Rory M. Farrell*
Rory M. Farrell