IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MICHAEL SIMMONS, | : | CIVIL ACTION NO. 3:15-cv-00317-SRU |
| individually and on behalf of all others | : | |
| similarly situated, | : | |
| | : | |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| CHARTER COMMUNICATIONS, INC., | : | |
| | : | |
| Defendant. | : | NOVEMBER 20, 2015 |

### DEFENDANT'S LOCAL RULE 56(A)1 STATEMENT OF UNDISPUTED FACTS

Pursuant to Local Rule 56(a)1, Defendant Charter Communications, Inc. ("Charter") submits the following statement of undisputed material facts in support of its Motion for Summary Judgment.

*Mr. Simmons's Phone Number Was Linked with a Charter Customer's Account*

1.  Charter has a customer whose "last name was also Simmons," and whose first name "was ▮▮▮▮." Ex. A (Link Dep.) at 25:17-24.

2.  Charter attempted to contact Ms. Simmons for purposes of a "migration" campaign, in which Charter was contacting existing internet customers for purposes of marketing additional Charter services.

    A.  Charter's "outbound telemarketing campaigns run on a monthly basis." *Id.* at 20:19-20.

    B.  Charter "create[s], on a monthly basis, lists that cover every customer -- current customer[s] that we would like to migrate to -- upsell to." *Id.* at 44:14-17; *see id.* at 20:20-21.

C.  Among other things, Empereon Marketing's ("Empereon") log of the calls to Mr. Simmons includes an indication "Mig Internet."  Ex. B (CHTR_00002).

D.  "MIG is an abbreviation for 'migration,' which means that this is a current customer that has one of [Charter's] services that we are attempting to sell multiple services to.  Internet, it would appear that this person already had Internet."  Ex. C (Shaar-Wildman Dep.) at 28:7-13.

E.  When asked " ███████████████████████████████████████████ ███████████████████████████████," Empereon Marketing testified " ████ "  When asked if " ███████████████████████████████████████████," Empereon testified ███████████████████████████████████████ ████ "  Ex. D (McRoberts Dep.) at 78:11-18.

3.  Charter sought to contact Ms. Simmons but did not have a functioning phone number for her.

A.  Charter testified that "this particular name [Ms. Simmons] and address for whom we did not have a working number was a subscriber to Charter, but the phone number that we had on record was not working."  Ex. A (Link Dep.) at 22:14-18.

4.  Where, as here, Charter does not have a working phone number for a customer or potential customer, it employs vendors to try to identify the working phone number, and if the vendor has significant confidence in the match, that phone number is added to Charter's marketing database.  That is how Mr. Simmons was associated with Ms. Simmons's account in Charter's database.

A.  Charter updates its phone records each month.  Charter testified that its "outbound telemarketing campaigns run on a monthly basis.  So we are pulling our lists on a

monthly basis.  One of the very first steps in that process to is to look at our database to see if there are addresses, people in our footprint, for whom we do not have a working phone number.  Each month we take all of those -- you know, either just the address or name and address, depending what we already have, and we send them to each of the vendors to find out if they can in fact find the number for us since we do not have a current working number in our database." Ex. A (Link Dep.) at 20:19-21:10.

B. The vendor that associated Mr. Simmons's phone number with Ms. Simmons's Charter account is called Relevate.  Charter further testified as follows: "Q. And so you would have made that sort of request or -- Charter would have made that request or order, from Relevate here, and they would have returned back what was the ▮▮▮ number associated with some address within Charter's footprint?  A. In this case." *Id.* at 21:11-22:17.

C. Once Mr. Simmons's phone number was associated with Ms. Simmons, Ms. Simmons's phone number for her account was updated with Mr. Simmons's phone number.  Charter further testified as follows:  "Q. Does that automatically update within Charter's internal records?  Does it automatically append the phone number to that address?  A. It does to the marketing database.  Just to the marketing database." *Id.* at 27:18-23.

D. Charter only uses the process if the vendor has a strong degree of confidence that the phone number matches the account.  Charter further testified: "Q. When you get that information back from Relevate, is there any sort of confidence level or score or flag or anything of that nature associated with it?  A. Yes, there is.  There are confidence

intervals that vendors will perform their matching on, and we specify what confidence intervals we will only accept." *Id.* at 28:20-29:5.

5.      Because Mr. Simmons's phone number was associated with Ms. Simmons's account, it was treated as the phone number of someone with whom Charter has an existing business relationship for purposes of "scrubbing" against relevant Do Not Call lists.

A.      Mr. Simmons's phone number "was, as all of [Charter's] phone numbers are, are regularly sent to PossibleNOW for scrubbing in the very beginning of our lift-generation process; PossibleNOW returned back the status of that number being on a federal do-not-call list but also the status that customer had an existing business relationship with Charter.  So that designation, in the absence of them on Charter's private do-not-call, which they were not, allows us to dial that phone number." *Id.* at 37:11-25.

B.      Empereon testified as follows: "█████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████" Ex. D (McRoberts Dep.) at 100:11-25.

### *Charter's DNC Policies and Procedures*

6. Charter's written policies for maintaining a DNC list are "written in a few different sources. Primarily, it's in our master services agreement and subsequent statements of work with PossibleNOW. It is also documented in the master services agreements and subsequent statements of work for our telemarketing vendors." Ex. A (Link Dep.) at 86:2-8.

7. Charter uses PossibleNOW's services for "scrubbing" phone numbers against all relevant Do Not Call lists.

   A. Charter "use[s] PossibleNOW as [Charter's] purveyor of [DNC lists], since they are also the FCC's vendor for the federal do-not-call list, so we trust that they have the best, most up-to-date knowledge of every state, because they do support the FCC, as well." *Id.* at 40:15-21; *id.* at 77:6-13 ("I can say we use them because they maintain the federal do -- the do-not-call list for the FCC. So it was our determination that they would be the best place to go because they're the FCC's vendor for that list. So we assumed that must be the gold standard.").

   B. PossibleNOW provides a variety of services to Charter to ensure compliance with the TCPA. *See* Ex. E (CHTR_00018) (describing services that ensure compliance with DNC rules, existing business relationship exceptions, and restrictions on calling wireless telephone numbers); Ex. F (CHTR_00019-28); Ex. G (CHTR_00029-33) (Attachment A—Services Provided and Attachment B—Customer Order Form); Ex. H (CHTR_00036-44) (additional PossibleNOW agreement for services); Ex. I (CHTR_00045-46) (Services Schedule #1 to Master Services Agreement); Ex. J (CHTR_00047-56) (PossibleNOW End User Agreement); Ex. K (PossibleNOW_Charter 0036) (sample Change Order for PossibleNOW services).

8. Under its policies, Charter needs to "scrub against the National Do-Not-Call List, the state do-not-call. We certainly need to understand which numbers are wireless." Ex. C (Shaar-Wildman Dep.) at 72:10-16.

9. Before sending phone numbers to its outbound telemarketing vendors, Charter "scrubs" phone numbers itself "using the [PossibleNOW] do-not-call solution and [various] add-ons." Ex. A (Link Dep.) at 73:13-19; *see also id.* at 37:13-21; *id.* at 84:5-15. PossibleNOW "performs the scrub for Charter" against the federal and state DNC registries. *Id.* at 73:3-12.

10. Among other things, PossibleNOW uses "all commercially reasonable, professional and customary methods to ensure that it obtains the correct and updated DO NOT CALL DATA from various applicable entities." Ex. F (CHTR_00019-28) at CHTR_00022.

11. Part of Charter's agreements for PossibleNOW's services "require[s] [Charter] to purchase access to the DNC Lists [including the national DNC list] from such publishers." Ex. I (CHTR_00045-46) at CHTR_00045.

12. Charter "regularly use[s] each of these services that it's signed up for with PossibleNOW." Ex. A (Link Dep.) at 62:25-65:4; *see also id.* at 63:14-15 (explaining that "[PossibleNOW] services are used on a regular monthly basis").

   A. Charter "send[s] th[e] universe of calling phone numbers into PossibleNOW and ask[s] for PossibleNOW to do all the rules -- apply the rules and scrubbing around state, local, federal -- and we also ask PossibleNOW to distinguish wireless and land lines. So that comes back to us based on what PossibleNOW returns. So they tell us who is restricted from being called. They make that clear to us. We then remove those customers from our lists and send the lists out to the vendors." *Id.* at 84:9-22; *see also id.* at 74:12-17 ("Q. So the file received from client here, as far as Empereon is concerned,

that's a scrubbed file?  A. This is our list that has been through all the scrubbing we've discussed to date -- so far.").

13. PossibleNOW also "gets the customer information from Charter that allows it to determine whether the person fits the criteria for an existing-business-relationship designation." *Id.* at 65:21-66:5.

14. Where a phone number "c[omes] back with an EBR [existing business relationship] status," it "tells us that it was eligible to be called under the EBR rules of the state in which the customer existed." *Id.* at 41:2-6.

15. "[I]t was through these [different] solutions [offered by PossibleNOW] that Charter -- or that PossibleNOW, A, identified or flagged the number as being on the do-not-call registry, and B, flagged this as an existing relationship, EBR, number . . . ." *Id.* at 71:21-72:8.

16. "Charter also has their own do-not-call list." Ex. C (Shaar-Wildman Dep.) at 72:10-16.

17. "The Charter internal do-not-call list can be updated from a variety of sources, one being customers calling into one of our customer-care centers and requesting that they be placed on our do-not-call list. A second possibility is if in fact, instead of calling the -- in lieu of calling our customer-care center, a customer could also write a letter requesting they be put on the do-not-call list. Again, it is flagged in the billing system. Another possibility is when we do our outbound telemarketing and we reach a customer and they say, as you know in the call logs here, Don't call me anymore. So we learn that by speaking to customer[s]. That is captured and retained by us and kept in our systems. So there's multiple sources for Charter's privacy list -- internal do-not-call list." *See* Ex. A (Link Dep.) at 48:3-24.

18.  ██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████  Ex. D (McRoberts Dep.) at 69:3-9; *see also* Ex. A (Link Dep.) at 38:15-19 ("Q. Now, just looking at how those parts relate to each other, if that number had been on the internal do-not-call list, would it have been called?  A. No, sir.").

### *Charter's Double-Check of Do-Not-Call Lists by Empereon*

19.  Charter sent Mr. Simmons's phone number to its vendor, Empereon Marketing for calling.  Ex. A (Link Dep.) at 34:4-10.

20.  The Master Services Agreement between Charter and Empereon requires the following:



*See* Ex. L (CHTR_00003-12) (Master Outbound Telemarketing Agreement) at CHTR_00008.

21. The requirements in the Master Outbound Telemarketing Agreement also include:



*See id.* at CHTR_00008-09

22. "[O]n top of [Charter's scrubs using PossibleNOW] . . . , four steps later, Empereon crosscheck[s]" numbers before calling them. Ex. A (Link Dep.) at 73:13-74:2. "They repeat the same scrubs that [Charter] performed previous to their receiving the file." *Id.*; *see also* Ex. D (McRoberts Dep.) at 71:25 ▇▇▇▇ Ex. D (McRoberts Dep.) at 104:23-105:4 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.

23. Empereon telemarketers "▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇" Ex. D (McRoberts Dep.) at 94:10-15.

9

24.      ██████████████████████████████████████████████████

████████████████████████." *Id.* at 94:21-95:2; *see also* Ex. M (Simmons Empereon 0001-59) at Simmons Empereon 0038; Ex. N (CHTR_00017) (Do Not Call Procedure and Action for Non-Compliance: Sales Professionals); Ex. O (CHTR_00013-16) (Empereon's "Do-Not-Call" Policy).

### *Phone Calls to Mr. Simmons*

25.     Because Mr. Simmons's phone number was believed to be the phone number for existing client Ms. Simmons, it was scrubbed using the "existing business relationship" rules.

   A.     "PossibleNOW returned back the status of [Mr. Simmons's] number being on a federal do-not-call list but also the status that customer had an existing business relationship with Charter.  So that designation, in the absence of them on Charter's private do-not-call, which they were not, allows us to dial that phone number." Ex. A (Link Dep.) at 37:17-25.

   B.     *See also* Ex. D (McRoberts Dep.) at 100:11-19 ("█████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████").

26.     Mr. Simmons received four telephone calls on behalf of Charter and placed one call to Charter in January 2015.  Ex. B (CHTR_00002) (Simmons Call Log).

27.     The first call, on January 9, 2015, lasted approximately 15 seconds.  *Id.*

28.     The content of the call was as follows:

████     ██    ████████████████████████████████████████████████
                ████████████████████████████████████████████████

10



Simmons Empereon 000064 (produced audio recording).

29. The second call was initiated by Mr. Simmons to Charter (and answered by an Empereon employee) the same day. Ex. B (CHTR_00002) (Simmons Call Log).

30. That call lasted approximately one minute. *Id.*

31. On that call, the following exchange occurred:



32. The third and fourth calls were on January 15 and 19, and both resulted in an answering machine picking up the calls. Ex. B (CHTR_00002) (Simmons Call Log).

11

33. Charter did not leave a message for Mr. Simmons. *Id.*

34. Mr. Simmons answered the fifth call, on January 20, 2015. *Id.*

35. During this call, Mr. Simmons indicated that he did not want to receive any more phone calls from Charter. *Id.*

36. Mr. Simmons's number "went on the Charter internal do-not-call list . . . [on] January 24th, 2015." Ex. C (Shaar-Wildman Dep.) at 111:23-112:3.

37. Mr. Simmons testified: "████████████████████████████ ████████████████" Ex. P (Simmons Dep.) at 77:19-78:2.

38. Mr. Simmons testified: ████████████████████████████ ████████████████████████████████████ *Id.* at at 90:5-15.

39. He also testified as follows: ████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████ *Id.* at 86:3-18.

Dated:  November 20, 2015    Respectfully submitted,

By:  */s/ Rory M. Farrell*
David E. Rosengren (ct05629)
Rory M. Farrell (ct29655)
McELROY, DEUTSCH, MULVANEY
& CARPENTER, LLP
One State Street, 14th Floor
Hartford, CT  06103
Telephone: (860) 241-2693
Facsimile: (860) 522-2796
drosengren@mdmc-law.com
rfarrell@mdmc-law.com

Jeffrey S. Powell (phv07106)
Ragan N. Naresh (phv07105)
Kathleen A. Brogan (phv07107)
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C.  20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200
jpowell@kirkland.com
ragan.naresh@kirkland.com
kathleen.brogan@kirkland.com

*Attorneys for Defendant*
*Charter Communications, Inc.*

**CERTIFICATE OF SERVICE**

    I certify that on November 20, 2015, a copy of the foregoing document was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the notice of electronic filing. Parties may access this filing through the court's CM/ECF system.

                              */s/ Rory M. Farrell*
                              Rory M. Farrell