# EXHIBIT C

```
 2   IN THE UNITED STATES DISTRICT COURT
 3   FOR THE DISTRICT OF CONNECTICUT
 4   Case No. 3:15-cv-00317-SRU
 5   ------------------------------------------x
 6   MICHAEL SIMMONS, individually and on
 7   behalf of all others similarly situated,
 8                    Plaintiff,
 9         - against -
10   CHARTER COMMUNICATIONS, INC., a
11   Connecticut Corporation,
12                    Defendant.
13   ------------------------------------------x
14                    September 17, 2015
                      9:09 a.m.
15
16   Deposition of 30(b)(6) witness AMY
17   SHAAR-WILDMAN, taken by the Plaintiff,
18   pursuant to Notice, held at the offices of
19   Kirkland & Ellis, LLP, 601 Lexington
20   Avenue, New York, New York, before Tammy
21   O'Berg, a Shorthand Reporter and Notary
22   Public of the State of New York.
23
24
25
```

                  AMY SHAAR-WILDMAN
   centers handle clients other than just
   Charter?
              MR. NARESH:  Objection.  Beyond
        the scope.
              Go ahead and answer.
       A.     Yes, they do.
       Q.     Do you know whether specific
   agents handle calls for clients other than
   Charter?
       A.     Agents are focused on Charter --
   what's the word -- they're exclusive to
   Charter, to our understanding.
       Q.     To the right of that, there's a
   column labeled Service.
              What does service mean?
       A.     This appears to be how Empereon
   designates the call type that they're
   making for us.
       Q.     What do you mean by "call type"?
   	A.     The type of customer and type of
   call that they're making on our behalf.
       Q.     So let's just run through the
   entries here starting with that first
   call, 1746, on January 9th, 2015.

1                AMY SHAAR-WILDMAN
2                Can you explain in plain
3    English, to the extent possible, what that
4    entry in the service column means?
5        A.    For the first call?
6        Q.    Yes.
7        A.    MIG is an abbreviation for
8    "migration," which means that this is a
9    current customer that has one of our
10   services that we are attempting to sell
11   multiple services to.
12               Internet, it would appear that
13   this person already had Internet.
14               PFP is our relationship with the
15   vendor.  It's a comp model -- compensation
16   model that we operate with them.
17               And not attempted sell, I'm not
18   exactly sure.  That's their description.
19       Q.    Let's break that down.
20               You don't know what the "not
21   attempted" means in that context?
22       A.    No, I'm not sure.  You have to
23   ask them.
24       Q.    Do you know what "sell" means in
25   that context?

1        AMY SHAAR-WILDMAN
2     A.    I'd have to ask them.
3     Q.    So you said that MIG means
4  migration, which means it's a current --
5  it's identified as a current Charter
6  customer.
7     A.    Uh-huh.
8     Q.    Where does that information come
9  from?
10    A.    That comes -- we supply the
11 vendor with the telephone number and the
12 customer to call.  So that comes from our
13 database team.
14    Q.    That would include, would it
15 not, not just that an individual is
16 identified as a Charter customer but also
17 the type of service that they already
18 have?
19    A.    Yes.
20    Q.    Going down to the next one below
21 that, Charter IB, can you explain what
22 that means?
23    A.    Oh, Charter -- that was an
24 inbound call.
25    Q.    If a person calls back -- if a

1          AMY SHAAR-WILDMAN
2 that referring to the specific databases
3 and things that are crosschecked during
4 the scrubbing process?
5     A.    I wouldn't -- it's not
6 databases.  The phone numbers are what's
7 under question.  So during that process,
8 it's determined whether or not that phone
9 number can be called.
10     Q.    So if you go to the right there,
11 it lists quite a few tables.
12         Is that what the file is
13 scrubbed against?
14     A.    Yes.
15     Q.    There are six tables or lists
16 there.
17         Who makes the decision of what
18 tables or lifts are the files scrubbed
19 against?
20     A.    Umm, these are all files that
21 they need to be scrubbed against.  So
22 PossibleNOW owns the relationship for
23 making sure that these are out there and
24 to be scrubbed against.  I'm not sure if
25 that answers your question.

1                AMY SHAAR-WILDMAN
2        Q.      No, but I can ask it
3    differently.
4        A.      Okay.
5        Q.      I guess there's six tables,
6    we'll call them here, which tables the
7    file is scrubbed against is determined by
8    Charter and PossibleNOW and not by
9    Empereon?
10       A.      Well, these are the files that
11   we have to scrub against.  We need to
12   scrub against the National Do-Not-Call
13   List, the state do-not-call.  We certainly
14   need to understand which numbers are
15   wireless.  Charter also has their own
16   do-not-call list.
17               So these are sort of
18   predetermined for us by the nature of
19   being predefined by calling on --
20       Q.      If PossibleNOW offered some new
21   table that did something that Charter
22   thought was of value in this process, it
23   could -- assuming it had the right
24   contracts with PossibleNOW and everything,
25   it could tell Empereon to also check that

1          AMY SHAAR-WILDMAN
2    table, right?
3           MR. NARESH:  I think what Nick
4      is asking, and correct me if I'm
5      wrong, is it Charter's decision which
6      tables to include or is it Empereon's
7      decision which tables to include.
8           MR. LARRY:  That is exactly it.
9       A.    It's not Empereon's.  It's --
10   Charter has the preselected, predetermined
11   business rules and processes by which the
12   list needs to be scrubbed.  Empereon also
13   has their own internal do-not-call list
14   that they scrub against.  If anything,
15   Empereon has the option and space to make
16   the do-not-call even tighter.
17      Q.    So if they felt that for
18   whatever reason Charter wasn't doing a
19   diligent enough job, it could cover itself
20   by doing XY or Z?
21      A.    It would always get tighter, it
22   would never get looser.
23      Q.    So then the next step down, file
24   return to Empereon from DNC Solutions
25   automatically, is that just the process

1  AMY SHAAR-WILDMAN
2  summarizing what they do for Charter.
3  Have you had other
4  communications with PossibleNOW about the
5  calls made to the plaintiff in this case?
6  A.  Not about the calls made to the
7  plaintiff.  It was calls -- the status of
8  the phone number that was in question.  We
9  asked them about.
10  Q.  Can you explain what you mean by
11  "the status of the phone number question"?
12  A.  We asked if that number that we
13  called, when it was put on the Charter
14  do-not-call list, so we could understand
15  that.
16  Q.  And the Charter do-not-call list
17  is the Charter internal do-not-call list
18  managed by PossibleNOW?
19  A.  That's right.
20  Q.  So if we turn back to Exhibit 2
21  really quickly, that's the call logs that
22  you looked at earlier?
23  A.  Yes.
24  Q.  So when you checked with
25  PossibleNOW to see the status of the 5165

1  　　　　　AMY SHAAR-WILDMAN
2  number on the internal -- the Charter
3  internal do-not-call list, was that
4  basically checking to see whether that
5  last entry there, the EMP DNC entry, had
6  been effectuated?
7  　　　A.　　Yes.
8  　　　Q.　　Did you ever talk to PossibleNOW
9  about whether the 5165 number was on any
10 other do-not-call registries?
11 　　　A.　　That number is also on the
12 National Do-Not-Call List, yes.
13 　　　Q.　　How did you learn that?
14 　　　A.　　From PossibleNOW.
15 　　　Q.　　Did they say whether it was on
16 the list as of January 9th through 20th,
17 2015?
18 　　　A.　　Yes, the date was there.
19 　　　Q.　　Did they explain whether it was
20 on any other do-not-call lists or
21 registries in addition to those two?
22 　　　A.　　No.
23 　　　Q.　　To be clear, did they explain
24 when the 5165 number went on the Charter
25 internal do-not-call list?

1         AMY SHAAR-WILDMAN

2    A.   Yes, I believe it was January

3 24th, 2015.

4    Q.   So you learned from them that at

5 the time the calls were placed in January

6 of 2015, the 5165 number was on the

7 National Do-Not-Call Registry.

8        Did you ask how --

9        MR. LARRY:  Scratch that.

10    Q.   Based on your understanding of

11 how the scrubbing process works, is that

12 something that ordinarily would have been

13 flagged by PossibleNOW as being on that

14 registry?

15        MR. NARESH:  This is probably a

16    line -- I think this is topics one and

17    two which are probably better for

18    Mr. Link.

19        MR. LARRY:  I'll save that

20    question for him then.

21    Q.   Did you talk to PossibleNOW

22 about how the 5165 number got called while

23 it was on the do-not-call registry?

24    A.   No, I didn't talk to them about

25 that.

```
 1            AMY SHAAR-WILDMAN
 2       Q.    So they said, though, that it
 3   was -- that it was, in fact, on there at
 4   the time it was called, and did they offer
 5   an explanation of how or why it was
 6   included in the campaign?
 7       A.    No, we didn't discuss that.
 8   They just provided the date.
 9       Q.    Do you know whether anyone else
10   at Charter talked to PossibleNOW about how
11   or why the number was called?
12       A.    No, I don't know if they did.
13       Q.    Do you know if anyone else at
14   Charter -- do you know if anyone else at
15   Charter talked to anyone -- talked or
16   e-mailed or any other communication with
17   PossibleNOW about that number, 5165, being
18   on the National Do-Not-Call Registry?
19       A.    Not to my knowledge, no.
20       Q.    So it's just you talking to
21   PossibleNOW, as far as you know, about
22   this issue?
23       A.    Correct.  We just obtained the
24   information.
25       Q.    So the number was identified to
```

1  AMY SHAAR-WILDMAN
2  to understand the call history and the
3  calls that were placed to that number.
4      Q.   But did you then, after
5  obtaining this information from
6  PossibleNOW, did you inform Empereon of
7  what you had found, that this number was
8  now on the do-not-call -- the internal
9  do-not-call registry and had been on the
10 National Do-Not-Call Registry?
11     A.   Yeah, well -- I'm not sure if we
12 had that conversation.
13          My conversation with Empereon
14 was, Did that number get dialed?  I needed
15 to understand how we provided it to them,
16 and we provided that number to them,
17 understanding that it was associated with
18 a current customer.  So...
19     Q.   At any point did you have a
20 subsequent conversation to make sure that
21 internal to Empereon, that it was aware or
22 recognized that the number was now on
23 Charter's internal do-not-call registry?
24     A.   They were actually the ones
25 responsible for putting it on Charter's

1        AMY SHAAR-WILDMAN
2   do-not-call.  It was their action.
3        Q.    So you didn't need to confirm it
4   with them because they had done it in the
5   first place?
6        A.    I didn't need it confirm it with
7   them because PossibleNOW confirmed it; and
8   the call history came from Empereon, so
9   the last call made to that customer was on
10  January 20th, 2015.
11       Q.    So when you asked for a letter
12  summarizing the services PossibleNOW was
13  offering, was that the same phone call or
14  e-mail as when you asked these questions
15  about the status of the number?
16       A.    No, it was after that.
17       Q.    So aside from the communication
18  where you asked for the status of the
19  number and then the communication where
20  you asked for this letter and this letter
21  was sent in response, have you had any
22  other communications with PossibleNOW
23  about the 5165 number?
24       A.    No.
25       Q.    When you had that initial

1      AMY SHAAR-WILDMAN
2  conversation -- the initial communication
3  about the status of the number, was that
4  telephone, e-mail?  How was that handled?
5      A.    E-mail.  It would have been
6  e-mail.
7      Q.    How many e-mails?  Do you
8  recall?
9      A.    A couple.
10     Q.    Was there anything else
11 discussed relating to the 5165 number in
12 those e-mails other than just its status?
13     A.    Its status and my last question
14 to them was, How was it that you received
15 information to make sure this was on --
16 and when -- the Charter do-not-call list?
17 And the response was, We received the
18 request from Empereon, it happened on this
19 date.
20     Q.    Moving over to the conversations
21 about this letter, when you requested this
22 letter, did you do that by phone or did
23 you do that in an e-mail?
24     A.    Umm, probably e-mail.
25     Q.    Do you recall whether anything