# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

MICHAEL SIMMONS,
      Plaintiff,

      v.

CHARTER COMMUNICATIONS, INC.,
      Defendant.

No. 3:15-cv-317 (SRU)

## <u>ORDER</u>

This case arises out of a dispute between a residential telephone subscriber, Michael Simmons, and a telephone and Internet communications provider, Charter Communications, Inc. ("Charter").  Simmons contends that Charter violated the Telephone Consumer Protection Act ("TCPA") by placing four telephone calls to Simmons over the course of a two-week period. Specifically, Simmons alleges that Charter violated 47 C.F.R. § 64.1200(c) by calling him notwithstanding the fact that his phone number was listed on the national do-not-call ("DNC") registry.  Simmons also alleges that Charter violated 47 C.F.R. § 64.1200(d) by failing to establish and implement procedures required by the TCPA prior to the initiation of telemarketing calls.

Charter moves for summary judgment (doc. # 39).  In its memorandum in support of its motion, Charter argues that it is not liable under the TCPA because it meets the regulatory safe harbors provided in 47 C.F.R. §§ 64.1200(c)(2)(i) and 64.1200(d).

Though I will examine the so-called "safe harbors" in my discussion regarding Simmons' oral motion to amend his complaint, I need not reach them in ruling on the instant motion for summary judgment.  I do not need to address Charter's arguments in support of summary

judgment because facts elicited at oral argument make it clear that Simmons' theory of liability fails as a matter of law.

## I.      Standard of Review

Summary judgment is appropriate when the record demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) (plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment).

When ruling on a summary judgment motion, the court must construe the facts of record in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the moving party.  *Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970); *see also Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d. 520, 523 (2d Cir.), *cert. denied*, 506 U.S. 965 (1992) (court is required to "resolve all ambiguities and draw all inferences in favor of the nonmoving party").  When a motion for summary judgment is properly supported by documentary and testimonial evidence, however, the nonmoving party may not rest upon the mere allegations or denials of his pleadings, but must present sufficient probative evidence to establish a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

"Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper."  *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991); *see also Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir. 1992).  If the nonmoving

party submits evidence that is "merely colorable," or is not "significantly probative," summary

judgment may be granted. *Anderson*, 477 U.S. at 249–50.

> The mere existence of some alleged factual dispute between the parties will not
> defeat an otherwise properly supported motion for summary judgment; the
> requirement is that there be no genuine issue of material fact.  As to materiality,
> the substantive law will identify which facts are material.  Only disputes over
> facts that might affect the outcome of the suit under the governing law will
> properly preclude the entry of summary judgment.  Factual disputes that are
> irrelevant or unnecessary will not be counted.

*Id.* at 247–48.  To present a "genuine" issue of material fact, there must be contradictory

evidence "such that a reasonable jury could return a verdict for the non-moving party."  *Id.* at

248.

If the nonmoving party has failed to make a sufficient showing on an essential element of

his case with respect to which he has the burden of proof at trial, then summary judgment is

appropriate.  *Celotex*, 477 U.S. at 322.  In such a situation, "there can be 'no genuine issue as to

any material fact,' since a complete failure of proof concerning an essential element of the

nonmoving party's case necessarily renders all other facts immaterial."  *Id.* at 322–23; *accord*

*Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (movant's

burden satisfied if he can point to an absence of evidence to support an essential element of

nonmoving party's claim).  In short, if there is no genuine issue of material fact, summary

judgment may enter.  *Celotex*, 477 U.S. at 323.

## II.     Background

Michael Simmons filed the instant action against Charter Communications, Inc., on

March 3, 2015.  On June 26, 2015, he filed an amended complaint.  *See* Doc. # 23.  In Count I of

the amended complaint, Simmons alleged that Charter violated the TCPA by using an automatic

telephone dialing system ("ATDS") in violation of 47 U.S.C. § 227(b).  In Count II, Simmons

alleged that Charter violated section 227(c) of the TCPA by failing to comply with the regulations set forth in 47 C.F.R. §§ 64.1200(c) and (d).  On November 6, 2015, the parties stipulated to the dismissal of Count I of the amended complaint.  Thus, Count II is the only remaining claim.

In order to give context to Simmons' remaining claim, it is necessary to begin with a discussion of how Charter came to possess Simmons' telephone number.  At some point prior to the events that give rise to this law suit, Charter attempted to place a call to one of its current customers, Sophie Simmons.[1]  Sophie had provided her telephone number to Charter at an earlier date.  When Charter attempted to contact that number, Charter realized that it was no longer a "functioning phone number."  Def.'s Local Rule 56(a)(1) Stmt. ("DLR") at ¶ 3.  Unable to reach an existing customer, Charter attempted to locate her new contact information.  To assist in locating Sophie, Charter employed the services of a vendor, Relevate, which specializes in locating individuals' contact information.  Such a vendor is often referred to as a "skip-tracer."  Charter employed the services of Relevate in order to ascertain Sophie's contact information.

After undertaking an investigation into Sophie's whereabouts, the skip-tracer provided Charter with a phone number—that we now know belongs to Simmons—which it believed belonged to Sophie.  Before calling Sophie, Charter employed the services of another vendor, PossibleNow, which specializes in a service called "scrubbing."  DLR at ¶¶ 7-8.  The purpose of "scrubbing" is to identify phone numbers that appear on state and national DNC lists so that Charter does not inadvertently call those numbers in violation of the TCPA.  *See id.*  As part of that process, PossibleNow also identifies numbers that it determines are associated with a consumer who has an existing business relationship with Charter.  *Id.* at ¶¶ 13-14.  PossibleNow

---

[1] The facts do not indicate that Sophie Simmons has any relation to Michael Simmons, with the exception of their common last name and the fact that they reside in the same general vicinity.

does not remove those numbers because, under the TCPA, Charter is legally permitted to call existing customers notwithstanding the fact that their number is on a DNC list.[2]  *Id.* at ¶ 25.

During the "scrubbing" process, PossibleNow identified Simmons' number as a number on the national DNC registry.  *Id.*  However, based on information provided to Charter by Relevate, it also was identified as belonging to Sophie Simmons, someone with whom Charter has an existing business relationship.  Accordingly, Simmons' number was listed as a number to which Charter could place a call.

Once Charter believed it had the authority to call Simmons' phone number, Charter sent the number to Empereon Marketing ("Empereon"), a telephone marketing company that places calls on Charter's behalf.  Empereon is a company in the business of providing telemarketing services.  It has extensive policies regarding compliance with the national DNC registry and internal DNC requests generated as a result of an individual's request not to be called.  DLR at ¶¶ 20-24; Def.'s Ex. O.  In addition to its own policies, Empereon has a contract with Charter, which sets forward additional safeguards regarding compliance with DNC requests.  DLR at ¶ 20.

On January 9, 2015, Empereon placed a call to Simmons' phone number in an attempt to reach Sophie Simmons.  During the first call, on January 9, 2015, Simmons informed the Empereon telemarketer that he did not consent to being recorded and then hung up.  That same day, Simmons called Empereon back in order to object to his voice being recorded and to request that Charter refrain from calling him.  *See* Pl.'s Local Rule 56(a)(2) Stmt. ("PLR") at 26. Charter disputes that Simmons made a do-not-call request on that date.  DLR at ¶ 31.  However, that fact is immaterial.

---

[2] Simmons disputes many of the facts regarding PossibleNow's relationship with Charter.  *See* PLR at 12-17.  For reasons stated below, such disputes are immaterial because they do not create a genuine dispute of material fact with respect to Empereon's own policies and procedures put in place prior to the initiation of the calls at issue.

Thereafter, Empereon placed three more calls to Simmons. The first two went to voicemail. The final one, on January 20, 2015, reached Simmons. During that call, Simmons again requested that he not be called by or on behalf of Charter. DLR at ¶ 35. By January 24, 2015, Simmons' phone number had been placed on Charter's internal DNC list.

Though often overlooked in the parties' papers, it is important to remember that Charter did not place a single call to Simmons. Rather, Empereon, a telephone marketing company, placed each call to Simmons on Charter's behalf.

## III.    Discussion

Michael Simmons filed this action in accordance with the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227. Section 227(c) grants a private right of action for individuals who have received a phone call (or calls) in violation of the various regulations promulgated by the Federal Communications Commission ("FCC"). 47 U.S.C. § 227(c)(5). In his remaining claim, Simmons alleges that he received a telephone solicitation made by, or on behalf of, Charter, in violation of 47 C.F.R. §§ 64.1200(c), (d), and (e).[3]

Charter responds by asserting that it is not liable under section 227(c) because it has demonstrated compliance with the safe harbor provision set forth in section 64.1200(c), and has the requisite policies and procedures to avoid liability under section 64.1200(d).

### A.  Applicable Law

Congress enacted the TCPA on December 20, 1991, to address telephone marketing calls and certain telemarketing practices that Congress found to be an invasion of consumer privacy. Section 227(c) creates a private right of action for any "person who has received more than one

---

[3] Subsection (e) provides that the "rules set forth in paragraph (c) and (d) of this section are applicable to [calls] to wireless telephone numbers . . . ." Accordingly, I will limit my discussion to subsections (c) and (d), knowing that subsection (e) makes those subsections applicable to situations, like this one, in which the calls were placed to the plaintiff's cell phone.

telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection . . . ."  47 U.S.C. § 227(c)(5).  The party may file a suit to enjoin future violations and/or "recover for actual monetary loss from such a violation, or to receive up to $500 in damages for each such violation, whichever is greater . . . ."  *Id.* at § 227(c)(5)(A)-(C).  The statute also provides an affirmative defense if a defendant can prove that it has "established and implemented, with due care, reasonable practices and procedures to effectively prevent telephone solicitations in violation of the regulations prescribed under this subsection."  *Id.* at § 227(c)(5).[4]

The FCC is vested with authority to issue regulations implementing the TCPA.  *See* 47 U.S.C. § 151.  In 2003, the Federal Trade Commission ("FTC") and the FCC jointly promulgated rules that together created the national DNC registry.  *See Mainstream Mktg. Servs., Inc. v. F.T.C.*, 358 F.3d 1228, 1234 (10th Cir. 2004).  The registry contains the telephone numbers of individual telephone subscribers who have indicated that they do not wish to receive unsolicited telephone calls from commercial telemarketers.  *See id.*  Telemarketers are prohibited from calling those individuals and are forced to comply with certain practices in order to ensure that they honor the individuals' DNC requests.  *See id.*

Section 64.1200(c) sets forth, inter alia, the prohibitions regarding calling individuals on the national DNC registry.  47 C.F.R. § 64.1200(c)(2).  It provides that a DNC request "must be honored indefinitely, or until the registration is cancelled by the consumer or the telephone number is removed by the database administrator."  Violation of this subsection subjects a telemarketer to liability under 47 U.S.C. § 227(c)(5).

---

[4] I do not address the general applicability of the statutory safe harbor because Charter does not assert that the statutory safe harbor shields conduct not protected by the regulatory safe harbors.

A defendant can avoid liability for calling an individual on the DNC registry if it can show that (1) it called the individual by accident, and (2) it has established adequate procedures in order to avoid mistakenly calling individuals on the registry.  47 U.S.C. § 64.1200(c)(2)(i). Courts have referred to subsection (c)(2) as one of the TCPA's "safe harbor" provisions.  *United States v. Dish Network LLC*, 75 F. Supp. 3d 916, 925 (C.D. Ill. 2014).

In order to show that its standards are adequate, the following procedures must be in place:

> A) Written procedures. It has established and implemented written procedures to comply with the national do-not-call rules;
>
> (B) Training of personnel. It has trained its personnel, and any entity assisting in its compliance, in procedures established pursuant to the national do-not-call rules;
>
> (C) Recording. It has maintained and recorded a list of telephone numbers that the seller may not contact;
>
> (D) Accessing the national do-not-call database. It uses a process to prevent telephone solicitations to any telephone number on any list established pursuant to the do-not-call rules, employing a version of the national do-not-call registry obtained from the administrator of the registry no more than 31 days prior to the date any call is made, and maintains records documenting this process.

*Id.*  A defendant will fall within this "safe harbor" provision and avoid liability if it can establish that it meets these standards and its call to the individual on the DNC registry was in error.

The FCC has also instituted a prohibition on calling residential telephone subscribers who, though not on the national DNC registry, have previously requested not to receive telemarketing calls made by, or on behalf of, a particular person or entity.  Section 64.1200(d) provides that:

> No person or entity shall initiate any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity.

47 C.F.R. § 64.1200(d).  Like its counterpart regulation, subsection (c), subsection (d) sets forth certain procedures that with which a telemarketer must comply prior to the initiation of a telemarketing call.  *See id.*  Prior to initiating such calls, the person or entity placing the call must adopt the following standards:

(1) Written policy. Persons or entities making calls for telemarketing purposes must have a written policy, available upon demand, for maintaining a do-not-call list.

(2) Training of personnel engaged in telemarketing. Personnel engaged in any aspect of telemarketing must be informed and trained in the existence and use of the do-not-call list.

(3) Recording, disclosure of do-not-call requests. If a person or entity making a call for telemarketing purposes (or on whose behalf such a call is made) receives a request from a residential telephone subscriber not to receive calls from that person or entity, the person or entity must record the request and place the subscriber's name, if provided, and telephone number on the do-not-call list at the time the request is made. Persons or entities making calls for telemarketing purposes (or on whose behalf such calls are made) must honor a residential subscriber's do-not-call request within a reasonable time from the date such request is made. This period may not exceed thirty days from the date of such request. If such requests are recorded or maintained by a party other than the person or entity on whose behalf the telemarketing call is made, the person or entity on whose behalf the telemarketing call is made will be liable for any failures to honor the do-not-call request. A person or entity making a call for telemarketing purposes must obtain a consumer's prior express permission to share or forward the consumer's request not to be called to a party other than the person or entity on whose behalf a telemarketing call is made or an affiliated entity.

(4) Identification of sellers and telemarketers. A person or entity making a call for telemarketing purposes must provide the called party with the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity may be contacted. The telephone number provided may not be a 900 number or any other number for which charges exceed local or long distance transmission charges.

(5) Affiliated persons or entities. In the absence of a specific request by the subscriber to the contrary, a residential subscriber's do-not-call request shall apply to the particular business entity making the call (or on whose behalf a call is made), and will not apply to affiliated entities unless the consumer reasonably

would expect them to be included given the identification of the caller and the product being advertised.

(6) Maintenance of do-not-call lists. A person or entity making calls for telemarketing purposes must maintain a record of a consumer's request not to receive further telemarketing calls. A do-not-call request must be honored for 5 years from the time the request is made.

*Id.*  A violation of subsection (d) gives rise to TCPA liability under section 227(c)(5).  47 U.S.C. § 227(c)(5).

Though subsections (c) and (d) are similar, it is important to note their distinctions. Subsection (c) is a direct prohibition on making calls to a particular subset of individuals (those on the national DNC registry).  A telemarketer violates that regulation by placing a call to a person whose number is on the registry.  The telemarketer may be saved from liability, however, if it establishes that it complied with the regulatory safe harbor provision.  *See* 47 C.F.R. § 64.1200(c)(2)(i).  Accordingly, the assertion of non-liability based on compliance with the safe harbor provisions may be properly classified as an affirmative defense.

Subsection (d), on the other hand, simply requires the institution of certain procedures prior to the initiation of telemarketing calls.  *Id.* at § 64.1200(d).  A telemarketer violates this subsection not by placing the calls themselves, but by failing to have the required procedures in place prior to the initiation of the calls.  *See Charvat v. GVN Michigan, Inc.*, 561 F.3d 623, 632 (6th Cir. 2009).  There is no statutory safe harbor for a violation of the requirement to have procedures in place prior to the initiation of a call.  In order to allege a violation of subsection (d), a plaintiff must show that the entity placing the calls failed to institute the proper procedures prior to the initiation of the call.  *Cf. id.*  There is no affirmative defense to be asserted.  If a defendant can show that it had instituted the proper procedures, plaintiff's claim under subsection (d) must fail for lacking an essential element of the claim.  *Cf. id.*; *see also Nat'l Mkt. Share, Inc. v. Sterling Nat. Bank*, 392 F.3d 520, 527 (2d Cir. 2004).

B. <u>Simmons' claims fail as a matter of law</u>

Simmons claims that Charter violated the TCPA by calling him notwithstanding the fact that his number was listed on the national DNC list.  *See* 47 C.F.R. § 64.1200(c).  More generally, Simmons also contends that Charter violated the TCPA by failing to implement proper policies and procedures prior to the initiation of telemarketing calls.  47 C.F.R. § 64.1200(d).  Charter seeks to rely on the regulatory safe harbors that preclude liability when a telemarketing company institutes the requisite policies and procedures in order to avoid TCPA violations.  *See id.* at §§ 64.1200(c)(2)(i), 64.1200(d)(1)-(6).[5]

At the outset, Charter need not rely on an affirmative defense because Simmons has failed to substantiate his allegations that Charter violated the TCPA by means of an underlying violation of subsections (c) or (d).  The parties do not dispute that Empereon was the company that placed the telephone call to Simmons that gave rise to the alleged violations of subsections (c) and (d).  The FCC has long differentiated between a telemarketer that initiates the call and the seller on whose behalf a call is made.  *See In re Joint Petition Filed by Dish Network, LLC (Dish Network)*, 28 F.C.C. Rcd. 6574, 6582 (2013).  In *Dish Network*, the FCC held that a seller "is not directly liable for a violation of the TCPA unless it initiates a call, but may be held vicariously liable under federal common law agency principles for a TCPA violation by a third-party

---

[5] Simmons contends that Charter waived its defenses by failing to plead them in its Answer.  *See* Pl.'s Opp'n to Mot. Summ. J. at 8, 15.  There is no merit to Simmons' contention. With respect to Simmons' allegations of a violation of section 64.1200(c), Charter unambiguously asserted an affirmative defense.  *See* Answer at 6 ("Second Defense"). Though it is true that Charter did not assert an affirmative defense with respect to subsection (d), Charter is not required to do so.  A defendant need not plead the failure to satisfy an element of plaintiff's prima facie case as an affirmative defense.  *See Nat'l Mkt. Share*, 392 F.3d at 527.  Subsection (d) liability requires the plaintiff to show that the defendant failed to institute proper policies and procedures prior to the initiation of a telemarketing call.  47 C.F.R. § 64.1200(d).  Charter properly preserved its defense of that claim by denying the allegation that it failed to institute the proper procedures.  *See* Answer at ¶ 46 (denying allegation in ¶ 46 of the amended complaint). Accordingly, Charter's defenses are not waived.

telemarketer." *Id.*  A person will only be held to have "initiate[d] a telephone call when it takes the steps necessary to physically place a telephone call." *Id.* at 6583.[6]

At oral argument, Simmons conceded that Empereon, not Charter, was responsible for physically placing each telephone call to Simmons.  Accordingly, Empereon is the only company that can be directly liable under subsection (c) for initiating a telemarketing call to an individual on the national DNC registry.  *See id.* at 6583-84.  Similarly, Empereon is the only company that can be directly liable under subsection (d) for initiating a telemarketing call without first implementing the requisite policies and procedures.  Though Charter may be liable for Empereon's violation(s) of the TCPA under a theory of vicarious liability, such a theory does not appear on the face of the amended complaint.  The fact that there is some language in the complaint that could be construed as advocating a theory of vicarious liability, *see* Amended Compl. at ¶ 44, does not alter my conclusion.  A review of the amended complaint in its entirety makes it clear that Simmons is proceeding against Charter under a direct liability theory.  *See* Amended Compl. at ¶¶  2, 45, 46.

In order to allege that a principal is vicariously liable for the conduct of an agent, a plaintiff must first allege that the agent is liable.  *Cf. Balintulo v. Daimler AG*, 727 F.3d 174, 192 (2d Cir. 2013).  At oral argument, Simmons conceded that he did not allege that Empereon is liable under subsection (c).  Such a conclusion is unavoidable even if Simmons had not conceded the point.  There are no specific allegations regarding Empereon's conduct in the amended

---

[6] Because Congress has not directly addressed the issue, and because the determination was a final order of the FCC, the interpretation must be afforded *Chevron* deference.  *See Gomez v. Campbell-Ewald Co.*, 768 F.3d 871, 878 (9th Cir. 2014), *aff'd*, 136 S. Ct. 663 (2016), *as revised* (Feb. 9, 2016); *see also Chevron, U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 843 (1984); *Leyse v. Clear Channel Broad., Inc.*, 2006 WL 23480, at *3 (S.D.N.Y. Jan. 5, 2006), *aff'd*, 301 F. App'x 20 (2d Cir. 2008).  Moreover, some courts have even held that FCC final orders have a binding effect on federal courts.  *See Dish Network, L.L.C. v. Fed. Commc'ns Comm'n*, 552 F. App'x 1 (D.C. Cir. 2014) (implying that FCC's order regarding vicarious liability under the TCPA is a final order).

complaint.  Accordingly, Simmons' claims against Charter based on an alleged violation of 47

C.F.R. §§ 64.1200(c), (d), cannot survive summary judgment.

C.   Denial of leave to amend

At oral argument, Simmons made an oral motion to amend his complaint in order to

assert a viable theory of vicarious liability.  Simmons contends that he would be able to amend

his complaint to assert, and then prove, that Empereon violated the TCPA and that Charter was

vicariously liable for Empereon's violations.

A plaintiff should ordinarily be granted leave to amend "unless there is evidence of

undue, delay, bad faith, undue prejudice to the non-movant, or futility."  *Milanese v. Rust-Oleum

Corp.*, 244 F.3d 104, 110 (2d Cir. 2001) (internal quotation marks and citations omitted).

Typically, leave to amend will only be denied as futile if the proposed amended complaint

cannot withstand a Rule 12(b)(6) motion to dismiss for failure to state a claim.  *Id.*  When the

proposed amended complaint is in response to an otherwise meritorious motion for summary

judgment, however, leave to amend may be denied as futile if "the factual foundations of [the]

new allegations are insufficient, as a matter of law, to withstand the motion for summary

judgment."  *Id.* (quoting *Azurite Corp. v. Amster & Co.*, 844 F. Supp. 929, 939 (S.D.N.Y. 1994),

*aff'd*, 52 F.3d 15 (2d Cir. 1995)).

Simmons' request for leave to amend his complaint for a second time is denied because,

based on information provided to me at oral argument, such an amendment would be futile.[7]

Even if Simmons could make allegations sufficient to survive a motion to dismiss, the facts make

---

[7] Even if there is an argument that Simmons' proposed amended complaint is not futile, permitting Simmons to amend his complaint at this stage of the litigation would be prejudicial to Charter.  Simmons has already amended his complaint once and the parties have conducted extensive discovery.

it clear that his proposed claim could not survive summary judgment.[8]  There is no reason to go through the laborious process of beginning the litigation anew only to arrive once more at the same position we are in at this moment.

In order to document the futility of Simmons' proposed amended complaint, I will analyze the motion for summary judgment assuming that Simmons had properly alleged a vicarious liability theory based on Empereon's liability as an agent.  The parties do not dispute that Simmons would likely be able to establish a principal-agent relationship between Charter and Empereon.  The amendment's futility rests on Simmons' inability to establish that Empereon violated the TCPA or, in the event that Simmons could establish liability under subsection (c), the failure to rebut the fact that Charter meets the statutory safe harbor provisions in that subsection.

### 1.  *Simmons' claims based on violation of subsection (c)*

Simmons' proposed amended complaint would allege that Charter violated 47 C.F.R. § 64.1200(c) when Empereon called Simmons at a phone number listed on the national DNC registry.  Charter does not dispute that Simmons is on the national DNC registry and accordingly should not have been called by Empereon.

There is reason to believe that Simmons, through an amended complaint, would be able to allege that Charter is vicariously liable for the calls that Empereon made to numbers, including Simmons', on the national DNC registry.  However, Charter seeks to take advantage of the statutory safe harbor that permits telemarketers to avoid liability if they can establish that the call

---

[8] At oral argument, Simmons kept referring to the fact that, thus far, the parties have been only engaged in "limited discovery."  He does not suggest, however, how the present scope of discovery has inhibited his ability to establish Charter's vicarious liability.  Assuming that Charter will not contest the existence of a principal-agent relationship with Empereon, Simmons has received all of the discovery he needs to determine whether Empereon itself violated the TCPA.

to the individual on the DNC registry was made in error and that they otherwise had the requisite procedures in place to avoid the likelihood of making such errors.  47 C.F.R. § 64.1200(c)(2)(i). Charter contends it meets both requirements: that the call to Simmons was a result of error and that Charter otherwise has the proper procedures in place to avoid the likelihood of such errors.[9]

   a.   The error

Charter explains that the phone call to Simmons was the result of Empereon's attempt to contact one of Charter's current customers, Sophie Simmons.  Charter had previously attempted to contact Sophie, but the phone number associated with her account had been identified as "not working."  DLR at ¶ 3.  After being unable to contact Sophie, Charter engaged the services of Relevate, which, through a process called skip-tracing, attempted to locate her.  Skip-tracing is a process through which information about a certain individual, in this case Sophie, is collected and analyzed in order to determine the person's whereabouts.  *See Echevvaria v. Diversified Consultants, Inc.*, 2014 WL 929275, at *8 (S.D.N.Y. Feb. 28, 2014).  It is often used in the debt collection process and, though it can give rise to a violation of section 227(b)'s prohibition on certain automatic telephone dialing system ("ATDS") practices, is a permissible manner of obtaining a customer's contact information.  *See Gaines v. Law Office of Patenaude & Felix, A.P.C.*, 2014 WL 3894348, at *6 (S.D. Cal. June 12, 2014) (implying that use of skip-tracing is permitted so long as the individual is manually contacted—as opposed to via an ATDS—to ensure that the person initiating the call has correct number); *see also Conrad v. Gen. Motors Acceptance Corp.*, 283 F.R.D. 326, 330 (N.D. Tex. 2012).

---

[9] If the complaint were amended to allege that Charter is liable for Empereon's actions, Charter would also be able to take advantage of the statutory safe harbor by showing that (1) the call was made in error; and (2) Empereon had the requisite procedures in place to avoid the likelihood of making such errors.  *See* 47 C.F.R. § 64.1200(c)(2)(i). Charter cannot be held vicariously liable for Empereon's conduct if that conduct was not proscribed by the TCPA. *Cf. Balintulo v. Daimler AG*, 727 F.3d 174, 192 (2d Cir. 2013).  Thus, an amended complaint would be futile regardless of whether the requisite procedures were put in place by Charter or Empereon.

Charter's vendor conducted its skip-tracing process and provided Charter with a phone number that we now know is associated with Simmons, the plaintiff.  Prior to calling the number in an attempt to reach Sophie, Charter engaged in "numerous checks" in order to ensure that it was in compliance with state and federal law.  *See* Def.'s Memo in Support of Mot. Summ. J. at 4; *see also* DLR at ¶¶ 9-15.  Rather than conduct the checks itself, Charter engaged the services of PossibleNow, a vendor that specialized in providing DNC list services.  *Id.*

PossibleNow works with Charter to "scrub" phone numbers that are either on the national DNC registry or Charter's internal DNC list.  *Id.* at ¶¶ 7-12.  If a number is on Charter's internal DNC list, it is not dialed under any circumstances.  *Id.* at ¶ 18.  However, if it is only on the national DNC list, it will be dialed if it is determined that it belongs to an existing customer.  *Id.* at ¶ 14.  After compliance with the "scrubbing" procedures, the number will be transferred to a different vendor, Empereon, which is responsible for placing the actual telemarketing calls.  *Id.* at ¶¶ 5, 19.

As a result of this procedure, Empereon placed four calls to Simmons in an attempt to reach Charter customer Sophie Simmons.  There is no dispute that Charter was attempting to reach Sophie, not Simmons.  PLR at 23.  Accordingly, Charter has established the first element of the regulatory safe harbor: that the calls were made in error.

Simmons' attempt to create a dispute of material fact with respect to the claim of error is futile.  A party can support a claim of error by showing that the telephone solicitation was made unintentionally.  *See In Re Dynasty Mortgage, L.L.C.*, 20 F.C.C. Rcd. 4921, 4929-30 (2005).  One method of establishing that the call was made in error is to show the "procedural breakdowns that led to such calls, as well as the steps that the seller has taken to minimize future errors."  *Id.* at 4929.  The FCC made it clear that a party could not claim "error" simply by

showing that it "meets all other safe harbor criteria or incorrectly believes that it need not comply with national do-not-call requirements." *Id*. In *Dynasty*, the defendant could not claim the calls were made in error because the evidence showed that it had placed the calls while being "aware of the unlawful nature of such calls." *Id*. Evidence that the defendant told customers that it was "exempt" from the DNC registry precluded its ability to claim that the calls were made in error. *Id.* at 4930.

In contrast, Charter has provided a detailed account of the steps that it took to avoid such error. Though Charter has not established that the calls to Simmons were a result of a procedural breakdown, it is not clear that procedural breakdown is the sine qua non of the safe harbor provision. The parties did not cite, nor am I aware of, any authority that would help elucidate the type of "error" needed to establish the first element of the subsection (c) safe harbor.

Absent any authority on the issue, I look to the ordinary definition of the term. *United States v. DiCristina*, 726 F.3d 92, 97 (2d Cir. 2013) (internal quotation marks and citations omitted) ("Where Congress provides no definition for a term in a statute, we consider the ordinary, common-sense meaning of the words."). The term "error" is defined as "[a]n assertion or belief that does not conform to objective reality; a belief that what is false is true or that what is true is false; [a] mistake." *Error*, *Black's Law Dictionary* (10th ed. 2014). Using the ordinary definition of the word "error" is in line with the TCPA's goal of encouraging the use of "reasonable practices and procedures." *See* 47 U.S.C. § 227(c)(5). Though the TCPA seeks to protect individuals' privacy, it also seeks to limit the liability of companies seeking to contact its existing customers. *CE Design, Ltd. v. Prism Bus. Media, Inc.*, 606 F.3d 443, 451 (7th Cir. 2010) (holding that a broad reading of the existing business relationship rule was in line with the FCC's intentions).

There is no doubt that Charter, in requesting Empereon to call Simmons' number notwithstanding the fact that his number was on the national DNC registry, did so under the mistaken belief that it was calling a number that belonged to Sophie Simmons.  In other words, the call was placed in error.

Simmons makes much of the fact that Simmons' number was contacted as a result of Charter's use of a skip-tracing service which, he claims, is inherently unreliable.  Simmons argues that the use of such a service makes it impossible for Charter to claim that the calls were made in error.  Entertaining such an argument would be equivalent to holding that skip-tracing is prohibited under the TCPA.  As discussed above, there is no authority to indicate that the process of skip-tracing is unlawful in this context.  *Cf. Gaines*, 2014 WL 3894348, at *6.  The only context in which skip-tracing has been held to be unlawful is in the context of the use of ATDS calling.  *See id.*  Even in those circumstances, the FCC has set forth a one-call safe harbor that recognizes the importance of a company's ability to contact its customers.  *Cf. In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 30 FCC Rcd. 7961, 8002 (2015).[10]

Simmons would have me hold, as a matter of law, that the skip-tracing at issue in this case is so inherently unreliable that Charter knew it was impermissibly contacting someone on the national DNC call list.  Such a holding would preclude Charter's ability to claim the call was made in error.  Even if it is possible for skip-tracing to produce results so unreliable that they preclude a telemarketer's claim of error, those circumstances do not exist in this case.

---

[10] The existence of a one-call safe harbor under section 227(b) is not directly applicable to subsection (c).  Unlike subsection (b), which is an outright prohibition on certain ADTS calls, subsection (c) ascribes liability only to those who fail to have proper policies and procedures in place to avoid calling individuals on the national DNC registry or on the company's internal DNC list.

Charter's representative, Kenneth Link, testified that Charter required a certain degree of confidence that phone numbers obtained through skip-tracing actually were the numbers of the customers it sought to reach.  *See* Pl.'s Ex. D at 30.  Link testified that Charter would only accept numbers that matched their existing customer list with the highest levels of confidence—such that it was, at a minimum, "highly likely" that the phone number belonged to an existing customer.  *See id.*  Thus, when Charter asked Empereon to dial Simmons' number, it was under the mistaken belief that the number, though on the DNC registry, could be contacted because it belonged to an existing customer.  That belief, though reasonable, was false.[11]  The call to Simmons was made in error.  Whether or not the error was excusable is something that will be evaluated when considering whether Charter had adequate procedures in place to avoid the likelihood of such errors.

### b.  Procedures

In order to take advantage of the subsection (c)(2)(i) safe harbor, in addition to showing that the challenged call was made in error, Charter must also show that it (or Empereon) has the requisite procedures in place in order to maximize compliance with the national DNC rules.  47 C.F.R. § 64.1200(c)(2)(i).  Charter sets forward its (and its vendors') policies and procedures in its memorandum in support of its motion.  Def.'s Mem. in Support of Mot. Summ. J. at 9-12.  Simmons contests Charter's claim that it has established and implemented written procedures to comply with the national DNC rules.  Pl.'s Opp'n to Mot. Summ. J. at 13-14.

There is no serious dispute that Charter has failed to provide evidence of a comprehensive, internal document that constitutes its policies and procedures regarding

---

[11] Though it is not necessarily a factor in asserting a claim of error, I highlight the fact that Charter's mistaken belief was reasonable.  Simmons has produced no evidence pointing to inherent flaws in Relevate's skip-tracing procedure. Simmons has only established that its procedure produced a single mistake.  A mistake is the definition of "error." *Error*, *Black's Law Dictionary* (10th ed. 2014).

compliance with the national DNC rules.  *See* DLR at ¶ 6.  Nonetheless, Simmons cites no authority to indicate that the written procedures required by subsection (c)(2)(i)(A) are required to be memorialized in a single, internal document.

In support of his argument, Simmons cites to cases construing subsection (d)'s requirement of a "written policy, available upon demand . . . ."  47 C.F.R. § 64.1200(d)(1); *see, e.g.*, *Roylance v. ALG Real Estate Servs., Inc.*, 2015 WL 1522244, at * 4 (N.D. Cal. Mar. 16, 2015).  In those cases, courts have held that subsection (d) requires a company to have a single, internal document that can be produced to its customers upon demand.  *See Roylance*, 2015 WL 1522244, at *4.  Indeed, Charter agrees that subsection (d)'s use of the phrase "written policy, available on demand," contemplates the existence of a single document that can be produced to the public.  Still, Simmons' reliance on subsection (d)'s requirements is misplaced.

Charter points out the distinction between subsections (c) and (d).  Though subsection (d) requires a "policy" that must be "available on demand," subsection (c) only requires the company to have "written procedures."  47 C.F.R. § 64.1200(d)(1).  Both the fact that the FCC used the term "procedures" instead of "policy," and the fact that such procedures are not required to be made "available on demand," indicates that subsection (c)(2)(i)(A) does not require a single, internal document outlining its procedures.

Instead, Charter contends that its written procedures "are written in a few different sources," including its agreements with PossibleNow and Empereon.  *See* DLR at ¶ 6; Def.'s Ex. L.  Charter's contract with Empereon is particularly relevant because it is Empereon's calls on behalf of Charter that allegedly gave rise to Charter's liability under subsection (c).  Charter can avoid liability if, inter alia, it shows it has set forth proper procedures to avoid calling, or in this case to avoid having Empereon call, individuals on the DNC registry.

Charter's contract with Empereon states that:

> Telemarketer will remove from the Campaign List all telephone numbers (i) that appear on applicable state or federal Do-Not-Call lists or registries (unless the call can lawfully be made to a telephone number notwithstanding its inclusion on a state or federal Do-Not-Call list); . . . [t]elemarketer will check the applicable state or federal Do-Not-Call lists or registries and remove the telephone numbers on those lists prior to initiating any telephone phone call or calling campaign on behalf of Charter and at least every 30 days thereafter or more often if required by state or federal law . . . .

Def.'s Ex. L at ¶ 9(a) (from "Terms and Conditions" of Master Outbound Telemarketing Agreement between Charter and Empereon).  Absent any authority to the contrary, I hold that the contract between Empereon and Charter constitutes adequate written procedures to ensure compliance with the national DNC rules insofar as Charter seeks to avoid liability for calls placed by Empereon, a co-signatory to the contract.[12]  When a company employs the services of a vendor to make calls on its behalf, there is no better way to ensure compliance with the TCPA than to include such compliance as an essential term of the contract.  Accordingly, Charter took the sufficient steps to comply with subsection (c)'s safe harbor provision and avoid liability under the TCPA for the calls Empereon placed to Simmons in violation of the national DNC rules.

### 2.   *Plaintiff's claims based on violation of subsection (d)*

Simmons claims that Charter violated 47 C.F.R. § 64.1200(d) by calling him without having first instituted procedures for maintaining a list of people who request not to receive calls made by, or on behalf of, Charter.  In seeking to amend his complaint, Simmons acknowledges

---

[12] Such a conclusion is not inconsistent with *Lushe v. Verengo Inc.*, 2014 WL 5794627, at *7 (C.D. Cal. Oct. 22, 2014), *reconsideration denied*, 2015 WL 500158 (C.D. Cal. Feb. 2, 2015), the only other authority I have found on whether contracts can form the basis of "written procedures" under the TCPA.  In that case, the court held that the contracts were insufficient evidence of written procedures because they only required the agents to "warrant that they were in compliance with all applicable law . . . ."  *Id.*  In the instant case, however, the contracts contain language that expressly requires the agent, Empereon, to perform its duties in compliance with the national DNC rules.

that Charter is only liable insofar as Simmons can establish that Empereon, not Charter, failed to have the requisite procedures in place prior to the initiation of the calls to Simmons.

Charter responds by arguing that Empereon has the requisite procedures in place that permit Empereon to make solicitation calls under subsection (d).  Unlike subsection (c), this subsection has nothing to do with the national DNC registry.  Rather, it is focused on the caller's procedures for maintaining its own DNC list.

There are six basic procedures that a caller must have in place before placing telemarketing calls to residential telephone subscribers.  *See id.* § 64.1200(d)(1)-(6) ((1) written policy for maintaining DNC list, available on demand, (2) adequate training of personnel, (3) recording, disclosure, and honoring of DNC requests, (4) identification of sellers/telemarketers, (5) application of DNC requests to affiliated entities, (6) maintenance of records of a DNC list).  The only procedures that Simmons complains were not instituted prior to the initiation of the calls to him are the procedures under subsections (d)(1) (written policy, available on demand) and (d)(3) (recording, disclosure, and honoring of DNC request).

   a.   Subsection (d)(1)

Simmons' amended complaint relied on Charter's failure to produce a single written policy of its own to establish that Charter failed to have a "written policy, available on demand," as required by subsection (d).  Given my ruling regarding Charter's lack of direct liability under the TCPA, Simmons now seeks to amend his complaint to allege that Empereon failed to have a written policy, available on demand, prior to initiating the calls to Simmons.

In support of its motion for summary judgment, Charter produced Empereon's "Do-Not-Call" Policy.  *See* Def.'s Ex. O.  The policy states that "[a] 'do-not-call' is a customer or non-customer who informs us orally or in written form that he or she does not want further

telemarketing solicitation from Empereon Marketing." *Id.*, Section II. Further, the policy states that "ANY REQUESTS WILL BE HONORED." *Id.* (emphasis in original). In moving to amend his complaint, Simmons does not allege any facts to indicate that he could raise a genuine issue of material fact with respect to the existence of Empereon's DNC policy.[13]

Simmons also fails to offer any evidence that the Empereon DNC policy is not available on demand. *Cf. Roylance v. ALG Real Estate Servs., Inc.*, 2015 WL 1522244, at *4 (N.D. Cal. Mar. 16, 2015), *report and recommendation adopted as modified*, 2015 WL 1544229 (N.D. Cal. Apr. 3, 2015) (in order to allege that an entity's written policy was unavailable upon demand of the customer, plaintiff must request to receive a copy of the policy). By its own terms, Empereon's policy states: "Any customer who requests a copy of this [DNC] policy is entitled to receive it as soon as possible." Def.'s Ex. O, Section II. Simmons has not alleged that he requested and failed to receive that policy.

  b.  Subsection (d)(3)

With respect to subsection (d)(3)'s requirement, Simmons argues that Charter has failed to establish a proper procedure regarding the recording and honoring of DNC requests. Once again, Simmons seeks to amend his complaint in order to assert that Empereon failed to establish such a procedure.

---

[13] Simmons attempts to raise an issue of material fact by mischaracterizing Empereon's policy. In his brief, and in further detail at oral argument, Simmons argued that Empereon's policy of honoring all DNC requests is, on its face, invalid because it fails to account for what happens if a customer initiates the call to Empereon and requests to be added to Empereon or Charter's DNC list. Once again, such an argument is unfounded. By its very terms, Empereon's policy states that "ANY REQUESTS WILL BE HONORED." Def.'s Ex. O, Section II. That unequivocal language does not, on its face, raise any doubts that Empereon has a policy of honoring requests made by Charter customers, regardless of whether it is Empereon or the customer that initiated the call. Furthermore, Empereon representative Bryan McRoberts testified that a DNC request made on inbound calls are recorded in the very same manner that they would have been recorded had the request been made on an outbound call. Def.'s Ex. D at 93. Accordingly, Simmons fails to raise a genuine issue of material fact with respect to the scope of Empereon's DNC policy.

In support of his arguments, Simmons alleges that, after receiving the initial call from Empereon on January 9, 2015, he called them back to request to be added to Charter's DNC list. Thereafter, Empereon proceeded to call Simmons three more times, the last of which occurred on January 20, 2015.  Simmons argues that the circumstances alone establish Empereon's failure to have a proper procedure for recording DNC requests.  Simmons rightly contends that a proper policy does not shield a defendant from liability if it is not fully implemented.  *See In the Matter of Dynasty Mortgage, L.L.C.*, 22 F.C.C. Rcd. 9453, 9466 (2007).

Charter responds by pointing to the fact that Charter effectuated Simmons' DNC request within 30 days, thus complying with section 64.1200(d)(3)'s requirement to have a recording procedure in place that ensures compliance with a DNC request within thirty days.  The parties do not dispute that the initial DNC request occurred on January 9, 2015, and it was complied with by the end of January, well before the 30-day limit set forth in subsection (d)(3).  Further, Charter asserts that Simmons cannot establish a subsection (d)(3) violation based solely on the fact that he received a call after his DNC request.  Charter argues that subsection (d)(3) only regulates the procedures put in place prior to the initiation of the call, not the call itself.

A subsection (d)(3) violation is based on the fact that a telemarketer failed to implement certain procedures prior to the initiation of a phone call.  *See Charvat v. GVN Michigan, Inc.*, 561 F.3d 623, 632 (6th Cir. 2009) ("The 'violation of the regulations' is therefore the initiation of the phone call without having implemented the minimum procedures.").  The regulations do not prohibit "actually calling an individual after the individual has requested placement on a do-not-call list . . . nor do the regulations specifically proscribe failing to record an individual's request to be placed on a do-not-call list."  *Charvat v. DFS Servs. LLC*, 781 F. Supp. 2d 588, 592 (S.D. Ohio 2011) (citing *Charvat*, 561 F.3d at 632).  Thus, in order to prove a subsection (d)(3)

violation, a plaintiff cannot rely solely on the fact that a provider failed to record or honor an individual's request to be placed on a DNC list. *See id.* Rather, the plaintiff must establish that the calls he or she received were initiated prior to the implementation of proper procedures. The existence of a single failure to record and honor an individual's request to be placed on a DNC list can be evidence of a failure to implement proper procedures, *cf. Dynasty Mortgage*, 22 F.C.C. Rcd. at 9466 (proof of failure to implement existing plan can support TCPA violation for failure to have a proper procedure), but it cannot be the sole basis of a section (d)(3) violation.

In the instant case, Simmons attests to the fact that he made a request to be placed on the DNC list on January 9, 2015. Subsequent to that request, he received three additional calls. The evidence shows that, though he eventually was placed on the DNC list, he was not placed on the list immediately after his alleged initial request. The mere fact that he received a call after his January 9 request is not a subsection (d)(3) violation. Per that regulation, Empereon is required to have a policy that records and honors a call-recipient's request within 30 days. Charter has established that Empereon had the requisite policies in place, *see* Def.'s Ex. O, and that it honored Simmons' request within 30 days. DLR at ¶ 37. Simmons has not put forward any evidence to dispute the existence of Empereon's policy and the fact that his DNC request was honored within 30 days.

That said, Simmons has put forward evidence that Empereon failed to implement its policies by failing to record and honor Simmons' DNC request to its office on January 9, 2015. Charter disputes that Simmons actually made a DNC request on January 9. In any event, the failure to record a DNC request is not itself a violation of subsection (d)(3). *See Charvat*, 781 F. Supp. 2d at 592. However, it could be used as evidence of a failure to implement proper procedures prior to the initiation of a call. The materiality of the January 9 call will depend on

25

whether the evidence of one failure to record a DNC request amounts to sufficient evidence of a failure to properly implement procedures for recording such requests.

Ultimately, absent more evidence, the fact that Empereon might have failed to properly record and honor Simmons' initial DNC request does not permit a jury to find that it failed to implement proper procedures. After all, it is undisputed that Empereon did log Simmons' DNC request on January 24, 2015, which resulted in Empereon's honoring of Simmons' original request within 30 days, as is required by the regulation.[14]

There are many reasons that Charter's customer service representative could have failed to record Simmons' January 9, 2015, DNC request. There is evidence to suggest that Simmons' request was not properly understood. Even under Simmons' interpretation of the call, he spent the majority of the call yelling at the representative for recording him. *See* PLR at 25-26. It is also possible that the representative simply forgot to record the request. In any event, evidence of a single violation of an entity's recording policy does not establish a complete failure to implement such a policy. *Cf. Dynasty Mortgage*, 22 F.C.C. Rcd. at 9466 (multiple failures showed that company policy, though effective on its face, was rendered ineffective by lack of compliance). In the absence of evidence sufficient to show that Empereon failed to implement its DNC policy, no reasonable jury could find for Simmons on his claim of a violation of

---

[14] Simmons once again tries to create an issue of fact by mischaracterizing the law. He argues that Empereon is required, under subsection (d)(3), to honor his DNC request "as soon as practicable." Although I am not sure where Simmons finds such language, it is certainly not within the statute or applicable regulations. Section 64.1200(d) requires telemarketers to "institute[] procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity." 47 C.F.R. § 64.1200(d). Of the required procedures, the company must have a procedure for recording and honoring DNC requests. *Id.* at § 64.1200(d)(3). Such request must be honored "within a reasonable time from the date such request is made," and such reasonable period "may not exceed thirty days from the date of such request." *See id.* There is no language requiring a telemarketer to honor the request as soon as practicable. Even if a single violation of a company's otherwise valid DNC policy could potentially give rise to liability under subsection (d)(3), I hold as a matter of law that it does not under circumstances presented here, where it is clear that the plaintiff's DNC request was honored within a reasonable period of time—half the period deemed by the regulation to be the outer limits of reasonableness.

subsection (d)(3).  No authority holds that subsection (d)(3) punishes single violations of an entity's otherwise proper procedures.

Accordingly, Simmons has not established that his alleged DNC request on January 9, 2015, raised a genuine issue of material fact that would warrant a denial of summary judgment. Because Simmons has not put forward any other evidence of Empereon's failure to have a proper procedure in place for honoring DNC requests, his claim based on a subsection (d)(3) violation fails.

## IV.     Conclusion

For the foregoing reasons, Charter's motion for summary judgment (doc. # 39) is granted. Simmons' amended complaint rests on the erroneous legal presumption that Charter, not the entity that initiates the calls on its behalf (Empereon), is required to comply with the TCPA requirements listed in 47 C.F.R. § 64.1200(c) and (d).  Such a conclusion is inconsistent with the fact that the TCPA holds the only the physical callers directly liable for such violations.  *See Dish Network*, 28 F.C.C. Rcd. at 6583.

Simmons' motion for leave to amend his complaint is denied because he has not put forward any facts, nor does he raise any potential facts that might be borne out with further discovery, that would enable him to survive the instant motion for summary judgment.  For that reason, summary judgment on the remaining count (Count II) is granted with prejudice.  The clerk shall enter judgment and close the file.

So ordered.

Dated at Bridgeport, Connecticut, this 30th day of March 2016.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge

27