UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| MICHAEL SIMMONS | : | No. 3:15-cv-00317(SRU) |
| | : | 915 Lafayette Boulevard |
| vs. | : | Bridgeport, Connecticut |
| | : | |
| | : | February 10, 2016 |
| CHARTER COMMUNICATIONS,INC. | : | |

- - - - - - - - - - - - - - - x

MOTION HEARING

B E F O R E:

    THE HONORABLE STEFAN R. UNDERHILL, U. S. D. J.

A P P E A R A N C E S :

    FOR THE PLAINTIFF:

        EDELSON PC
            350 North LaSalle, Suite 1300
            Chicago, Illinois  60654
        BY:  JAMES DOMINICK LARRY, ESQ.

    FOR THE DEFENDANT:

        KIRKLAND & ELLIS LLP
            655 Fifteenth Street, N.W., Suite 1200
            Washington, D.C.  20005
        BY:  RAGAN NARESH, ESQ.
            KATHLEEN A. BROGAN, ESQ.

        McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP
            One State Street
            14th Floor
            Hartford, CT  06103
        BY:  RORY M. FARRELL, ESQ.


            Sharon L. Masse, RMR, CRR
            Official Court Reporter
            915 Lafayette Boulevard
        Bridgeport, Connecticut  06604
            Tel: (860)937-4177

1          (Whereupon, the following proceedings commenced

2    at 12:39 p.m.)

3          THE COURT:  Good afternoon.  We're here in the

4    Simmons vs. Charter Communications.  Could I have

5    appearances, please.

6          MR. LARRY:  James Larry for the plaintiffs, Your

7    Honor.

8          THE COURT:  I'm sorry, I didn't catch that.

9          MR. LARRY:  James Larry for plaintiff and the

10   class, Your Honor.

11         THE COURT:  Thank you.

12         MR. FARRELL:  Good afternoon, Your Honor.  Rory

13   Farrell of McElroy, Deutsch, Mulvaney & Carpenter, and I'm

14   here at counsel table with Attorneys Ragan Naresh and

15   Kathleen Brogan, and we represent the defendant, Charter

16   Communications.  This afternoon, Attorney Naresh will be

17   handling oral argument.

18         THE COURT:  Okay, very good.  Thank you.

19         All right.  Well, have a seat.  I've got a few

20   questions for you I wanted to start with.

21         First off, Mr. Larry, the calls here that are

22   the subject of the complaint were not made directly by

23   Charter, is that right?

24         MR. LARRY:  That's correct, Your Honor.  Would

25   you like me to approach?

1          THE COURT:  No, wherever you're comfortable is

2   fine.

3          MR. LARRY:  That's correct, Your Honor.

4          THE COURT:  Okay.  And so if that's the case,

5   why does it matter what their policies are?  In other

6   words, if they're having this done through basically an

7   agent, don't we have to worry more about what the agent's

8   policies are rather than what Charter's policies are,

9   because the statute -- excuse me, the regulation basically

10  talks about no person shall initiate any call, in effect,

11  unless.  So we don't have Charter initiating a call; we

12  have an agent working for Charter initiating the call, it

13  sounds like.

14         MR. LARRY:  Well, it's certainly correct that

15  the calls were initiated by Empereon on Charter's behalf,

16  but I would submit that both Charter and Empereon's

17  policies are relevant in the sense that the policies for

18  effectuating do-not-call requests on Empereon -- or by

19  Empereon agents are relevant, but so is the maintenance of

20  the do-not-call list and the actual addition of numbers to

21  that list, and that's not something that Empereon is doing

22  in-house for Charter.  That's something that Charter has

23  outsourced to a different vendor, in this case

24  PossibleNOW.

25         THE COURT:  Right, but -- okay, but the point is

1  it's being done by a vendor.  Is there reason to believe,

2  based on this record, that Charter is maintaining its own

3  do-not-call list?

4        MR. LARRY:  My understanding, based on the

5  deposition of Charter's 30(b)(6) representative, is that

6  the list is maintained by PossibleNOW.

7        THE COURT:  Right.

8        MR. LARRY:  And what's relevant about that is

9  that we have seen no documents, no written policies

10  available to produce upon request, relating to how that

11  list, the internal Charter do-not-call list, is handled,

12  how it's managed, how the numbers are treated on it.

13        THE COURT:  Were those requested?

14        MR. LARRY:  All documents relating to the

15  management of the internal do-not-call list were

16  requested.  What we received were contracts between

17  Charter and PossibleNOW setting forth PossibleNOW's

18  obligations, but we didn't see written policies and

19  certainly not written policies available on demand to a

20  customer relating to --

21        THE COURT:  Okay, let's be clear when you say

22  "policies."  Did you subpoena PossibleNOW?

23        MR. LARRY:  We did subpoena PossibleNOW.

24        THE COURT:  And what did you get?

25        MR. LARRY:  Not much.

1          THE COURT:  Well, okay, that's not helpful.

2   What did you get?  Did you get a policy or not?

3          MR. LARRY:  No.  We did not get a written policy

4   that could be produced --

5          THE COURT:  Okay.

6          MR. LARRY:  -- regarding Charter's do-not-call

7   list.

8          THE COURT:  All right.

9          MR. LARRY:  We received documents relating to

10  some of the various services that were mentioned in the

11  letter from PossibleNOW to Charter, created for the

12  purposes of this litigation, but they weren't -- they

13  weren't policies specific to how any internal do-not-call

14  list is managed.  And those certainly haven't been

15  submitted in support of Charter's motion, if they exist.

16         THE COURT:  Okay.  Let me just understand your

17  theory.  Charter does not make the calls; somebody else

18  makes the calls.

19         MR. LARRY:  At least with respect to this

20  plaintiff, that's correct.

21         THE COURT:  Right.  Charter does not maintain

22  its own do-not-call list; somebody else does that.

23         MR. LARRY:  That's also my understanding of it,

24  although there seems to be some confusion in -- in the

25  exhibits and the motion papers on that.

1          THE COURT:  Okay.  So what -- you've only sued

2     Charter.

3          MR. LARRY:  Correct.

4          THE COURT:  So how is it that Charter has

5     violated the law here?  If they have a contract requiring

6     their vendor to do what's required under the law, how are

7     they responsible at this point for a violation of the law?

8          MR. LARRY:  Well, certainly -- certainly the

9     issues regarding agency and vicarious liability would be

10    issues in the case going forward in terms of establishing

11    liability, but as we were dealing with the limited

12    discovery issues relating to do-not-call policies and

13    procedures and the auto dialer issue, the scope of their

14    knowledge or awareness of whether those policies were

15    being complied with -- the policies in the contracts, that

16    is -- were not at issue.  We requested that Charter

17    provide the documents that would be produced upon request

18    relating to do-not-call policies, and nothing relating to

19    PossibleNOW was produced.

20         PossibleNOW is in charge of managing the

21    internal do-not-call list.  If a customer were to request

22    that, we have seen no evidence that anything from

23    PossibleNOW would be produced to that customer.  All we've

24    received from Charter is a master services agreement,

25    which was marked confidential, as well as a letter written

1   by an employee of PossibleNOW, after the initiation of

2   this litigation at the request of a Charter employee,

3   describing generally the services available to Charter.

4          So the issue here and what we're -- where we're

5   working from at the outset is that Charter is the one

6   directing Empereon to make these calls; they're being made

7   at Charter's request on Charter's behalf for the benefit

8   of Charter to sell Charter services; and Charter has also

9   retained vendors, including PossibleNOW, to manage other

10  aspects of its business, which is fine.  We're not saying

11  they can't do that.  But what we are saying is that if

12  they're going to outsource the management of their

13  internal do-not-call list, then they need to be able to

14  produce the policies and procedures relating to that,

15  rather than merely a contract saying that such a list will

16  be managed in some fashion.  And while we've seen the

17  contract, we haven't seen anything relating to the actual

18  internal do-not-call policy.

19          THE COURT:  Okay, but if they don't maintain a

20  do-not-call list themselves, why do they need a policy

21  regarding a list that they're not maintaining?

22          MR. LARRY:  We haven't seen a policy from them

23  or from PossibleNOW.

24          THE COURT:  Okay.

25          MR. LARRY:  I'm not going to sit here and say

1   they need to maintain a policy for an internal do-not-call

2   list.  If the vendor they're using provides one on demand

3   to a customer, that's fine.

4           THE COURT:  Right.

5           MR. LARRY:  But we haven't seen that policy from

6   Charter or from PossibleNOW.  All we've seen is a contract

7   and a description of services that were offered but not

8   all utilized.  I guess to put it --

9           THE COURT:  So your theory is that Charter is

10  liable because you haven't seen anything from PossibleNOW

11  that would bring PossibleNOW into compliance with the

12  statute?

13          MR. LARRY:  That's close.  I mean, we are on

14  Charter's summary judgment motion here, so my position is

15  slightly different, although largely similar, and that is

16  we haven't seen any policies relating to the internal

17  do-not-call list provided by Charter, who hasn't

18  maintained on their behalf, or provided by PossibleNOW.

19  And absent evidence of those lists, there's no basis for

20  summary judgment.

21          THE COURT:  Well, okay, but you've only sued

22  Charter.

23          MR. LARRY:  Correct.

24          THE COURT:  Have you made allegations that

25  they're vicariously liable rather than directly liable?

1            MR. LARRY:  I believe they're in the complaint

2    that they are -- that the calls are made on -- by Charter

3    or on Charter's behalf for the benefit of Charter.

4            THE COURT:  Well --

5            MR. LARRY:  And to the extent that --

6            THE COURT:  It says, for example, in paragraph

7    2, "Defendant" -- meaning Charter -- "made unsolicited

8    telemarketing calls to consumers."

9            And I didn't focus on this completely, but

10   paragraph 3, "Defendant made telemarketing calls" to --

11   "requiring Defendant to cease all unsolicited calling

12   activities."

13           It appears to me that the complaint is based

14   upon the theory that Charter made these calls directly.

15   Paragraph 11, Defendant made these unsolicited telephone

16   calls.  Twelve, Defendant repeatedly made telemarketing

17   calls.

18           So I don't see -- I'd love to have you point out

19   to me why there's a vicarious liability theory set forth.

20   It looks to me like it's all direct.

21           MR. LARRY:  So, for instance -- and I'm not

22   disputing the paragraphs you've cited, Your Honor, do say

23   what they say, but, for instance, paragraph 44, Defendant

24   violated Section 64.1200(c) by initiating or causing to be

25   initiated telephone solicitations.

1          And to the extent the Court would like further

2     clarification or development of that theory, the vicarious

3     liability theory, that's certainly something we could do

4     in an amended complaint at this point with the benefit of

5     the documents that are being produced.  And to the extent

6     the Court feels like there is insufficient factual record

7     of vicarious liability at this point, that's something we

8     would certainly desire to do full discovery on.

9          What we've been focusing on during this limited

10    initial discovery and summary judgment period in advance

11    of full merits discovery and in advance of class discovery

12    is whether Charter, or in this case its agents, had

13    sufficient policies and procedures in place to fall within

14    the various safe harbor provisions and whether or not auto

15    dialer was used.  The auto dialer is now out of the

16    picture, but we're still looking generally at whether

17    Charter or its agents had those policies and procedures in

18    place.

19          THE COURT:  But what I'm struggling over is if

20    Charter has agreed by contract to have somebody else do

21    these functions, they're not doing them, and it's not

22    clear to me they have an obligation to maintain any

23    policies directly.  In other words, they don't maintain,

24    apparently, a do-not-call list.  They have all that kind

25    of off -- somebody else is doing that, right?

1       MR. LARRY:  Correct.

2       THE COURT:  So why would they need a policy

3   about maintaining a do-not-call list that they don't

4   maintain?

5       MR. LARRY:  Charter itself -- I'm willing to

6   concede that Charter doesn't need to have that policy in

7   its possession or manage it if the vendor acting on its

8   behalf in fact does have that policy; and if, as the

9   regulations require, when one of the other vendors calling

10  on Charter's behalf -- when the vendor actually

11  responsible for making the calls places the call, that

12  policy from the other vendor who's actually managing the

13  list can be provided to the caller upon request, but we

14  haven't seen that.

15      So my position isn't that they need to maintain

16  a separate or parallel policy from PossibleNOW.  It's --

17  if they want to outsource that to PossibleNOW, then they

18  need to make sure that the company they're outsourcing it

19  to complies with the regulations on their behalf to make

20  sure that when someone is called on Charter's behalf --

21      THE COURT:  Right.

22      MR. LARRY:  -- a policy can be provided.

23      THE COURT:  This is a theory that's not in your

24  complaint.  So I'm looking at a summary judgment motion on

25  the complaint, and you're opposing it saying, Well, we

1  have another theory, or we have another party, or we have

2  something else we could do, but how is that a defense to

3  summary judgment on the existing complaint?  Maybe that's

4  a different lawsuit.

5           MR. LARRY:  If the Court would like us to amend

6  to name PossibleNOW and Empereon or to provide further

7  detail regarding the scope of vicarious or agency

8  liability, we're certainly willing to.

9           THE COURT:  Well, yes, I understand that.  The

10  question is whether -- well, these calls were made when?

11           MR. LARRY:  They were made earlier -- well, not

12  earlier this year.  They were made in 2015.

13           THE COURT:  Okay.  And so --

14           MR. LARRY:  To properly respond to your previous

15  question, Your Honor, Charter is not -- Charter's basis

16  for summary judgment is that they have no liability for

17  calls made on their behalf.  Charter's basis for summary

18  judgment is them saying, We do, in fact, have all these

19  policies and procedures -- and we disagree about that --

20  but they're saying, We do have these vis-a-vis our agents

21  acting on our behalf.  And what I'm saying is if they are

22  going to employ these agents to act on their behalf and if

23  they're going to claim the benefit of those agents'

24  supposed policies, then those policies that the agents

25  have themselves need to be adequate, and we're not seeing

1    that here.

2              THE COURT:  Okay.  Let's go back to my first

3    question.  Have you taken the position that Charter

4    initiated calls?

5              MR. LARRY:  I am not taking that position now

6    based on limited discovery.

7              THE COURT:  Okay.  So if they didn't initiate

8    any calls, your theory has to be vicarious liability.

9              MR. LARRY:  Correct.

10             THE COURT:  But what's the authority for the

11   proposition that an entity that does not initiate a call

12   can be vicariously liable for calls made by others on its

13   behalf?

14             MR. LARRY:  There's an abundance of FCC

15   authority -- if the Court would like me to submit it, I'd

16   be happy to -- as well as numerous case law decisions

17   interpreting that.  Under the FCC's view, which, depending

18   on various court decisions, is binding under either the

19   Hobbs Act or under Chevron deference, when a call is --

20   issues of vicarious liability in the TCB context are

21   decided on ordinary agency principles.  So in this case,

22   Charter has retained Empereon to make the calls on its

23   behalf and for its benefit under contract.

24             THE COURT:  And so the issue is whether Empereon

25   maintains the necessary policies to prevent --

1    MR. LARRY:  That's one of the issues.  The other

2    issues -- Charter has a scope of responsibilities that it

3    has to honor prior to making any call or having any

4    telemarketing call made on its behalf.  In this case,

5    Charter has chosen to diffuse those responsibilities to

6    numerous vendors, not just to a single vendor.  So it has

7    this entire operation set up, which we're not contending

8    is unlawful in structure, but it has this operation set up

9    where it has various arms handling various

10   responsibilities.  Empereon makes the calls.  Empereon

11   trains the calling agents.  There are other vendors making

12   the calls, too, that aren't at issue because they didn't

13   call the plaintiff.  And then it has Empereon handling the

14   list scrubbing, as well as the hosting and maintenance of

15   its internal do-not-call list.

16        Our position is that if Charter is going to set

17   up this wide-ranging network of agents to handle outbound

18   telemarketing calls and compliance on its behalf, then

19   those agents are effectively it, and those agents need to

20   have compliant policies and procedures per the

21   regulations.

22        THE COURT:  But you haven't alleged that the

23   agents violated the TCPA in any manner; and if they didn't

24   violate the TCPA, then obviously Charter can't be

25   vicariously liable for a nonviolation.

1          MR. LARRY:  Well, I agree that the complaint

2    could use some enhancement with regard to the allegations

3    that calls were initiated on Charter's behalf, but there

4    are allegations that it was caused to be initiated on

5    Charter's behalf.

6          THE COURT:  Okay, and where is the allegation

7    that says that Empereon or PossibleNOW violated TCPA and

8    that Charter is responsible for that violation?

9          MR. LARRY:  There isn't one naming Empereon.  At

10   the time the lawsuit was filed, we didn't know that the

11   calls were made by an outbound calling agent rather than

12   by Charter itself.

13         THE COURT:  Right.

14         MR. LARRY:  And that's why we're certainly happy

15   to amend the complaint or take whatever action the Court

16   deems necessary to name Empereon either as an actor

17   directly -- directly or jointly and severally liable or

18   merely as a party acting on Charter's behalf.  But at the

19   end of the day, the buck stops with Charter.

20         THE COURT:  Well, it may or it may not, but you

21   have to bring an action based upon the theory that you're

22   espousing now, it seems to me.  I mean, how can you say

23   that they're vicariously liable when you haven't ever

24   alleged that their agents violated the TCPA in any way?

25         MR. LARRY:  Well, that gets back to the issue --

1    to the amendment issue.  I concede that the majority of

2    the allegations here deal with Charter itself, but we'd be

3    happy to amend that to specifically name the conduct by

4    the agents.

5           But as to Charter's summary judgment motion,

6    it's not based on a lack of allegations or evidence

7    regarding agency liability, and it's also not a motion to

8    dismiss on either 12(b)(6) or 12(c) regarding the

9    sufficiency of the complaint.  Their defense is that they

10   have the proper policies and procedures, and that defense

11   necessarily depends on the vendors acting as their agents.

12          So to the extent the Court would like

13   clarification or additional allegations regarding the

14   agency relationship, we're certainly happy to provide

15   that.  We can amend; we can take whatever action the Court

16   desires.  But as far as Charter's summary judgment motion

17   goes and Charter's burden at this point, it hasn't moved

18   on that basis, and we would request that, to the extent

19   the Court sees an issue there, we be granted the right

20   under Rule 56(d) to conduct discovery and confirm the

21   scope of the vicarious or agency liability here.

22          And if it turns out there isn't, then we can

23   just -- that there isn't a basis for it, we can dismiss

24   and sue those agents directly.  I don't think that's going

25   to be the case, but at this point in time, given the

1    procedural posture of the case, they haven't moved to

2    dismiss on an agency basis.  They're actually necessarily

3    depending on it.

4         And to the extent the Court thinks the

5    allegations in the complaint are no longer accurate, given

6    the discovery, or that we need to supplement them in some

7    way, we're certainly happy to do so, but I don't think

8    it's a proper basis for summary judgment at this point,

9    given the limited immediate discovery schedule that was

10   put in place.

11        THE COURT:  So you want to start all over again,

12   basically?

13        MR. LARRY:  No, I would be happy to have --

14   well, we wouldn't be starting all over.  We've gotten rid

15   of the auto dialer issue.  They were right about that one,

16   we were wrong, and we dismissed it.

17        And I don't think we need to start over on the

18   policies and procedures issues.  If the Court finds that

19   Charter's agents' policies and procedures are adequate and

20   we lose summary judgment on that basis, that wouldn't be

21   starting over.  The case would be done.

22        If the Court denies summary judgment as to this

23   limited issue, which was the schedule put in place at the

24   beginning of the case, we still have to prove all the --

25   we have to still prove all the elements of our case.  We

1    still have to --

2          THE COURT:  You've mentioned four or five times

3    now this limited discovery, like it's a big problem.  What

4    discovery have you not been able to take that you believe

5    is necessary to oppose this motion?

6          MR. LARRY:  I think we have the discovery

7    necessary to oppose this motion.  I don't think this

8    motion raises issues of agency liability, and we --

9          THE COURT:  Because the complaint didn't.  I'm

10   trying to figure out why you keep complaining about the

11   scope of discovery if you have everything you need to

12   oppose the motion.

13         MR. LARRY:  I believe we have everything we need

14   to oppose the issues raised in the motion.  They didn't

15   move to dismiss the complaint for failure of agency

16   allegations.  They didn't even say in their summary

17   judgment motion that they shouldn't be liable because they

18   didn't make the calls at issue.  They didn't make agency

19   an issue.  So we have the evidence we need to oppose the

20   motion.

21         THE COURT:  Right, but we can forget about

22   agency, can't we?  It's undisputed that they didn't make

23   any calls.

24         MR. LARRY:  That's correct.

25         THE COURT:  Summary judgment.  You haven't

1    alleged a viable theory.  Summary judgment.

2         MR. LARRY:  I think the issue, Your Honor, is

3    that we tailored our discovery and the amendment or lack

4    thereof when we dismissed the auto dialer claim on this

5    narrow set of issues that we were -- that we needed to

6    focus on, which was auto dialer, was it used, policies and

7    procedures, were they in place.  And to the extent the

8    Court is going to dismiss the case outright on the basis

9    of something that they hadn't raised in their motion as a

10   basis for dismissal, we would request that any such

11   dismissal be without prejudice.  They aren't saying the

12   case should be dismissed because they didn't make the

13   calls, because they know they can't say that, because

14   there is an agency relationship here.

15        THE COURT:  Well, they can say they didn't make

16   the calls, and that's an element of your proof, and

17   there's no evidence in the record to substantiate that

18   element of proof.  And so, ordinarily, summary judgment

19   would be granted for a failure of proof.

20        Now, you have another theory that's being raised

21   today for the first time, I think.  We can talk about

22   that.  But you keep coming back to, We haven't gotten

23   enough discovery.  You've said it five or six times, and

24   I'm just trying to figure out is there something you're

25   complaining about that the Court limited you from doing

1  that has somehow prejudiced you?  I don't understand that

2  to be the case.  So if there is, I want to hear about it.

3          MR. LARRY:  Sure.  So in the initial scheduling

4  order, we said all this discovery should take place at

5  once, that we should take discovery on everything and that

6  if they -- if we limited discovery --

7          THE COURT:  Slow it down.

8          MR. LARRY:  Judge, I'm sorry.

9          THE COURT:  How has the limitations on discovery

10  prejudiced your client?

11          MR. LARRY:  By complying with the limited

12  discovery order issued at the beginning of the case, which

13  was the policies and procedures in play and the auto

14  dialer, and not requesting improperly information beyond

15  those bounds, focusing on those two issues, my client was

16  not able -- did not find it proper to request information

17  pertaining to elements that weren't at issue at this point

18  in the case.  When we scheduled --

19          THE COURT:  Well, you don't take discovery on

20  things that are not at issue in the case, do you?  You

21  just said, We couldn't take discovery on things that were

22  not at issue in the case.

23          MR. LARRY:  There's a very specific scheduling

24  order issued that instructed us to focus on Charter's

25  affirmative defenses --

1              THE COURT:  Right.

2              MR. LARRY:  -- regarding do-not-call

3    liability --

4              THE COURT:  Right.

5              MR. LARRY:  -- and the auto dialer issue.

6              THE COURT:  I understand that.

7              MR. LARRY:  We tailored our discovery to those

8    points.

9              THE COURT:  Right.  And how have you been

10   prejudiced?  Just a moment ago you said, We couldn't take

11   any discovery on issues that were not in the case.

12   Well --

13             MR. LARRY:  The prejudice would arise from

14   dismissal on the basis of something outside of those

15   limited issues upon which we were told to focus discovery.

16             THE COURT:  No.

17             MR. LARRY:  In this case the element --

18             THE COURT:  What discovery do you need to take

19   to confirm that Charter did not make the calls at issue?

20   You've admitted that.

21             MR. LARRY:  Sure.  We don't need additional

22   discovery to confirm that, but to confirm our theory of

23   liability, on agency liability, we would need --

24             THE COURT:  No.  Right.  If you were permitted

25   to amend the complaint, you would need additional

1    discovery, right?

2              MR. LARRY:  Correct.

3              THE COURT:  Right.  So you haven't been

4    prejudiced about discovering anything that's at issue in

5    the case so far.

6              MR. LARRY:  So to the extent the Court is

7    inclined to enter any sort of summary judgment order on

8    that basis, we'd request that that be limited to a finding

9    that Charter itself did not make the calls at issue, at

10   which point we would also request that any dismissal be

11   without prejudice and we be granted leave to amend

12   to assert --

13             THE COURT:  I understand you want to amend your

14   complaint and change the theory.  Let me hear why that

15   isn't appropriate.

16             MR. NARESH:  Yes, Your Honor.  May I approach?

17             THE COURT:  Wherever you want is fine.

18             MR. NARESH:  Good afternoon.

19             THE COURT:  Good afternoon.

20             MR. NARESH:  I'll focus on this -- the amendment

21   issue in particular, and we would oppose any amendment for

22   several reasons.

23             First, on the -- just the timing, to put it in

24   context, I mean, this case was -- there has been an

25   amendment already in this case, so this would be the

1  second amendment in the case.

2         This is also the second lawsuit filed against

3  Charter by the same plaintiff's counsel trying to come up

4  with a claim in hope that discovery might lead to

5  something.  We've pointed out the *Schnetzler* case before

6  Judge Shea previously and the Simmons case now, and

7  there's case law for the proposition that one cannot file

8  a lawsuit and then seek discovery and then amend based on

9  that.  That's the fishing expedition line of cases.

10         So we'd oppose that in part because the

11  limitation on discovery on the do-not-call claim, there

12  was a -- our initial position was let's focus on the auto

13  dialer, and Your Honor agreed, as Judge Shea agreed.  They

14  pointed out they kind of tacked on this do-not-call claim

15  specific to Mr. Simmons, and we said, Fine, then let's do

16  discovery on the auto-dialer issue and the do-not-call

17  claim.  And that was the discovery that proceeded, and

18  then they dismissed the auto-dialer claim, leaving the

19  do-not-call claim.  And so I haven't found any meaningful

20  limitation on discovery.

21         The limitation is it has to be limited to the

22  do-not-call claim, and that is the claim that is at issue.

23  And so I don't -- I don't believe there has been any

24  prejudice to the plaintiffs based on the limitation of

25  discovery because, effectively, by dismissing the ATDS

1  claim, the auto dialer claim, the only thing left is the

2  do-not-call claim.

3         THE COURT:  Right, but now the position is we

4  didn't understand at the beginning that Charter did not

5  make these calls directly but rather had them made through

6  agents.  So why shouldn't they be allowed to amend and do

7  discovery on the adequacy of the policies maintained by

8  the agents?

9         MR. NARESH:  Well, just as a practical matter,

10  we're long down the line of, you know, where amendment is

11  usually given.  Usually, it's typically given early in the

12  case before discovery, and we're well after that.  And

13  this would be the second time that they're amending, which

14  also counsel is against giving further leave to amend.

15         But then in terms of the agency, we did

16  discovery in the *Schnetzler* case with the same plaintiff's

17  counsel, and they understood the relationship in that

18  case.  You know, early on in this case -- you know, we

19  identified Empereon very early on in the case, and there

20  was no motion to amend.  We just went down the full course

21  of discovery for several months at substantial cost, going

22  down this path based on the complaint, the amended

23  complaint that was before us.  And then to now, in

24  response to a summary judgment motion, to say, Wait a

25  minute, let's try it again, that is prejudicial to us, and

1  this is -- this will be -- you know, we've gone through

2  this twice already with these same plaintiff's counsel

3  and, essentially, we have to go through it a third time,

4  which it's been a substantial expense just defending

5  against these lawsuits which we believe are meritless to

6  begin with.

7      THE COURT:  Well, I don't think I can really

8  hold Simmons responsible for the related case or the

9  similar case, even if he's got the same lawyer.  I mean,

10 the question really is, in this case, why shouldn't we

11 figure this out and see whether there's been a violation?

12 I mean, do you have reason to believe that Empereon and

13 PossibleNOW in fact have policies in place that would

14 satisfy the --

15      MR. NARESH:  Yes, and frankly, we produced the

16 Empereon policy, for example.  As Your Honor pointed out,

17 there is -- the regulation talks about calls -- no call

18 shall be initiated, and there is an Empereon policy which

19 we produced as Exhibit O to our summary judgment motion.

20 There's no dispute that that's available on demand.

21      And the whole point that Mr. Larry is raising at

22 this point with respect to kind of a Charter-specific

23 policy is totally hypothetical construct.  This isn't a

24 case in which Mr. Simmons requested a copy of a policy.

25 Had he requested a copy of the policy, he would have

1    received the Empereon policy, which is, for purposes of

2    these phone calls, would be the calls that are placed on

3    Charter's behalf.  And that policy has been produced, and

4    it was part of our -- part of the record.

5              THE COURT:  All right.  And so what about with

6    respect to the do-not-call list maintained by PossibleNOW?

7              MR. NARESH:  So, again, the calls here are

8    placed by Empereon.  The record is clear.  It's not placed

9    by Charter.  And the record is also clear there is that

10   policy for the Empereon list.  And the record is also

11   clear that if a request is made of Empereon to be put on

12   the do-not-call list, that is a list that is both for

13   Empereon and for Charter.  So that person wouldn't receive

14   any phone calls from Empereon, they wouldn't receive any

15   phone calls from Charter, and Mr. Link, Charter's

16   representative, testified to that, and that's part of the

17   record as well.

18             THE COURT:  Right, but here Mr. Simmons did

19   receive four calls.

20             MR. NARESH:  Correct.

21             THE COURT:  And the question is whether those

22   calls violated the Act because he was on the do-not-call

23   list.  So I take it you are suggesting that the error that

24   occurred here was not a misdialing but rather a

25   misunderstanding that Mr. Simmons' number was a number of

1  someone you were permitted to call.

2          MR. NARESH:  Correct.  Charter has a customer,

3  the same last name, from the same small town in

4  California, and on the front end, Charter believed it was

5  calling Ms. Simmons and inadvertently called Mr. Simmons.

6  They both have the same area code, live in the same small

7  town in California, and so that was the error.

8          THE COURT:  And is your authority that that type

9  of error is an error of the type to be recognized by the

10  statute?

11          MR. NARESH:  There's very little case law on the

12  error requirement, and the regulation itself just talks

13  about "an error," and we certainly would say, just as a

14  common sense approach, that constitutes an error.  There

15  isn't -- there's nothing specific in the ordinance saying

16  it has to be an error of a certain type.

17          THE COURT:  And the fact that he was called

18  again, notwithstanding requesting, at least at some

19  point -- I know there's a little bit of a question about

20  precisely when or whether he sufficiently asked -- but

21  your position is as long as it happens within 30 days,

22  it's okay?

23          MR. NARESH:  That's what the regulation says,

24  yes.  And then under our version, it happened within four

25  days; under their version, it happened within 15 days.  So

1  under either version, it happened in half the time allowed

2  under the rules.

3          THE COURT:  All right, and that's with respect

4  to the internal do-not-call list, "Don't call me," this

5  particular calling entity.  What's the interaction between

6  the, I'll call it the national do-not-call list and the

7  specific internal do-not-call list?

8          MR. NARESH:  Sure.  So they're set forth in the

9  different regulations.

10          THE COURT:  Right.

11          MR. LARRY:  It's (c) and (d).  For (c), there's

12  no dispute that he was on the national do-not-call list,

13  and so the requirements are slightly different.  The

14  reason that he received a call, despite being on the

15  national do-not-call list, is because of the established

16  business relationship exception by which a company is

17  allowed to call somebody on the national do-not-call list

18  even if -- but they're not allowed to call somebody who's

19  on their internal do-not-call list.  So once Mr. Simmons

20  gets added to an internal do-not-call list, he didn't

21  receive any more phone calls.

22          THE COURT:  Was there an existing business

23  relationship between Simmons and Charter?

24          MR. NARESH:  So Ms. Simmons and Charter, yes.

25          THE COURT:  No, right, I understand that, but

1  can you rely upon that relationship -- you have to fall

2  back on the error, don't you?

3        MR. NARESH:  Correct, and that's the work that

4  we think the error requirement is doing in the regulation.

5  Essentially, the way -- I mean, the way the TCPA is kind

6  of written large, it's focused -- you know, it's not

7  focused on these kind of -- on these detailed provisions;

8  it's focused on reasonable practices.

9        And the TCPA itself isn't focused on having a

10  one hundred percent nobody-ever-gets-called compliance

11  rate.  It's saying you've really got to take due care, and

12  it can't happen very often, but if it happens every once

13  in a while, you're not going to be liable for violating

14  the TCPA.  And so that's the work that the error

15  requirement, in our view, is doing to say, Look, it's got

16  to be a mistake, but you still have to use due care to

17  implement reasonable practices and procedures.  But if

18  there was no -- if there had been an existing business

19  relationship with Mr. Simmons himself, I don't think we'd

20  be here.  There wouldn't be a lawsuit.

21        THE COURT:  Right, right.  All right, so on C,

22  you're relying on the error and the existing relationship

23  with Ms. Simmons; and on D, you're relying on the adequacy

24  of policies?

25        MR. NARESH:  So taking the complaint as

1  drafted -- and we agree, Your Honor, there isn't enough in

2  here on the whole vicarious liability theory.  Our view is

3  if that's the theory, then Empereon's policy is the

4  governing policy because Empereon is the entity that made

5  the phone call -- that initiated the phone calls, which is

6  what the regulation talks about.  And I have a copy

7  of Exhibit O.

8          THE COURT:  I have it here.

9          MR. NARESH:  Okay.  So under -- I mean, part of

10 the reason we think that the whole amendment shouldn't be

11 granted is it would be futile.  So even under their

12 theory, I still think we would win based on the existence

13 of the vendor having this policy, because it's entirely

14 hypothetical, the idea that -- I mean, Mr. Simmons doesn't

15 allege and he can't allege that he called Charter and

16 said, I want a copy of the Charter-specific policy as

17 opposed to the entity that called me.  The entity that

18 called on Charter's behalf would have been Empereon, and

19 Empereon had a policy on Charter's behalf which was

20 available, which is what the regulations require.

21         THE COURT:  So you don't think there needs to be

22 any further discovery to permit the plaintiff to deal with

23 the summary judgment even if we consider a constructive

24 amendment to raise the agency theory?

25         MR. NARESH:  Correct, Your Honor.  We don't

1  think there ought to be any further discovery.  The idea

2  of the agency theory, these facts have been in the record

3  for many months, since at least last summer.  Empereon has

4  been part of the -- part of the picture.  That deposition

5  happened four months ago.  The discovery of Empereon was

6  last summer.  We identified Empereon as the entity that

7  actually placed the calls, you know, eight, nine months

8  ago.

9          THE COURT:  All right.  And with respect to (c),

10  potential (c) liability, do you have to have written

11  procedures regarding keeping people off of the -- or

12  complying with the national do-not-call list; and if so,

13  do you?

14          MR. NARESH:  Yes, so (c) and (d) are slightly

15  different.  So (d) talks about a written policy available

16  on demand.

17          THE COURT:  Right.

18          MR. NARESH:  And (c) talks about written

19  procedures.  It's a different word than "policy" because

20  there's no on-demand requirement.

21          THE COURT:  So you're relying on the contracts

22  you have with the vendors?

23          MR. NARESH:  Correct, which -- which actually,

24  it's -- it's Exhibit L of our summary judgment motion.  It

25  is very, very detailed and provides a how-to and

1  specifically references the need to use PossibleNOW as the

2  scrubbing agent and kind of sets forth the procedures in

3  significant detail.  It's Section 9 of Exhibit L.

4         THE COURT:  Okay.  Let me just ask whether

5  there's any authority for the proposition that having

6  procedures set forth in a bilateral contract is sufficient

7  to satisfy.

8         MR. NARESH:  So there's no -- there's very

9  little case law on the written procedures language.  There

10  is -- I think that the wording of the regulations is

11  intentional, that one is a written policy available on

12  demand, and one is written procedures without the

13  "available on demand," and I think there's meaningful

14  difference between procedures and a policy.

15         Procedure is a how-to, and it seems completely

16  reasonable for a how-to to be set forth in the contract

17  for the entity that's going to be implementing it.  It's

18  basically a user guide of this is what you need to do, as

19  opposed to a policy, which contemplates that it is

20  something that would be accessible to the public, for

21  example; and so a procedure set forth in the contract

22  under the plain language of the regulation itself seems

23  to -- seems to do the trick.

24         But there isn't case law discussing that one way

25  or another, whether or not a contract can be a written

1   procedure.  But the availability on demand, I do think

2   that that got muddied up in the briefing, so I just wanted

3   to make sure that's clear, that for (c), it's not an

4   available-on-demand piece.

5         THE COURT:  I understand.  Okay.  Let me find

6   out from Mr. Larry how he wants to respond to your

7   arguments.

8         MR. NARESH:  Thank you, Your Honor.

9         MR. LARRY:  Thank you, Your Honor.  So I'd like

10   to address a few points raised by counsel.  One was that

11   essentially because Empereon has a do-not-call policy, in

12   this case a four-page policy, that that covers the

13   do-not-call requirements on behalf of both Charter and

14   Empereon.  And the issue with that is that in their

15   corporate representative's 30(b)(6) deposition, he made

16   very clear that for calls that are inbound to Empereon,

17   just like the one Mr. Simmons had in this case, Empereon

18   is not responsible for adding individuals to the Charter

19   do-not-call list, nor does Empereon manage that list in

20   any way generally.  So the idea that Charter, by

21   outsourcing the calls, is going to entirely outsource

22   do-not-call compliance falls short here because Empereon

23   is not managing the list, and Empereon doesn't add people

24   to the list when they make requests on the inbound calls,

25   despite identifying themselves as Charter.  And that was

1  in Mr. Link's deposition.

2         THE COURT:  So how did it happen in this case,

3  because he was added to the list, wasn't he?

4         MR. LARRY:  He was eventually added to the list

5  after one of those very same types of calls where he

6  called back and said -- and we contend Mr. Simmons swore

7  in an affidavit -- he said, Don't call me.  I believe we

8  submitted the recording of that.  We understand there's a

9  dispute on what he, in fact, said.

10        THE COURT:  No, no.  Okay, but my point is, he

11 called Empereon.

12        MR. LARRY:  He called Empereon back on the same

13 number Empereon used to call him.

14        THE COURT:  Right.

15        MR. LARRY:  An Empereon agent answered,

16 identified himself by his name and as being Charter --

17        THE COURT:  Right.

18        MR. LARRY:  -- pursuant to the previous call on

19 the call-back number.

20        THE COURT:  And he gets added to the list within

21 30 days?

22        MR. LARRY:  The regulation states it's not a

23 30-day floor; it's as soon as practicable but no later

24 than 30 days.  And, in this case, it is practical -- it

25 was practical to do it within 30 days, as shown by the

1  fact that his second request was, in fact, processed

2  within 30 days, a point Charter makes in its brief.  They

3  take the position it was done within four days.

4          THE COURT:  Okay.  I guess I'm not following

5  you.  You're complaining that the Empereon policy can't

6  insulate Charter from liability for maintenance of the

7  do-not-call list, but I don't understand how Simmons can

8  raise that issue since he was -- he doesn't have a claim

9  that he wasn't put on that list within the period of time

10  set forth by the regulations.

11          MR. LARRY:  Sure.  So the issue is that Charter

12  or agents acting on its behalf in this case are not

13  allowed to make any telemarketing calls unless they

14  satisfy the conditions of (d).  And the issue is that they

15  haven't maintained a written policy on demand for

16  do-not-call compliance.  Empereon has a four-page

17  document.  There's some question about whether it is, in

18  fact, available on demand, but it certainly doesn't

19  encompass the full scope of do-not-call compliance.

20  That's the issue.  It's partial.  It deals with very

21  specific scenarios, some of which were not what arose

22  here.

23          THE COURT:  All right.  So what aspect of the --

24  of Exhibit O do you think is inadequate?

25          MR. LARRY:  Let me turn to Exhibit O.  So there

1    are really two issues here.  One, the exhibit doesn't deal

2    with the maintenance of the list, because Empereon doesn't

3    do that itself.  That's another vendor.

4              THE COURT:  Okay, and what provision of law

5    requires that the procedures available to the public cover

6    that issue?

7              MR. LARRY:  I think it's part of the written

8    policy on demand.  The written policy has to cover

9    addressing requests to not be called by or on behalf of

10   that entity, which it doesn't here.

11             THE COURT:  Well, your thinking of it is

12   interesting, but I'm looking for some sort of authority

13   that requires it.  In other words, you're saying, as a

14   matter of law, this is insufficient.  What's the basis of

15   that argument other than your opinion about what ought to

16   happen here?

17             MR. LARRY:  I'm saying it doesn't cover factual

18   scenarios that do, in fact, occur.  On its own face it

19   doesn't do so.

20             THE COURT:  Are they required by any statute or

21   regulation to include every potential scenario that might

22   arise?

23             MR. LARRY:  I don't think they're required to

24   cover every potential scenario, but this is a potential

25   scenario that they were aware of and accounted for.  It's

1     one of two relevant ones, which is either they're making

2     an outbound call or they're receiving an inbound call,

3     which they've contemplated by giving -- using specific

4     numbers as call-back numbers.

5              THE COURT:  I'm just asking you for what

6     authority you have to suggest that this policy and

7     procedure is inadequate.  The regulations say that they

8     have to have a policy -- excuse me -- yes, a policy,

9     written policy available to the public.

10             So here's a written policy, it's available to

11    the public from what I'm being told, and now you seem to

12    be arguing that even though they have a written policy

13    that's available to the public, it's somehow inadequate.

14    So what regulation, statute, decision of a court, decision

15    of the FTC says this is inadequate?

16             MR. LARRY:  So I think there are a couple of

17    issues there, the first being I think it's unclear whether

18    this was, in fact, available to the public.  It was

19    designated as confidential when it was produced.  But

20    second, the *Dynasty Mortgage* decision has instructive

21    language regarding the fact that the policies themselves

22    can't just be any policy.  They can't have something

23    that's just called a do-not-call policy that doesn't

24    actually adequately address the issues.  It has to be a

25    policy that's reasonably designed to prevent the unlawful

1  calls at issue.  And here --

2       THE COURT:  Well, look at II, Roman Numeral II.

3  A do-not-call is a customer or a noncustomer who informs

4  us orally or in written form that he or she does not want

5  further telemarketing solicitation from Empereon

6  Marketing.  Any requests -- this is all caps -- any

7  requests will be honored.  So that seems to be an adequate

8  policy.

9       MR. LARRY:  Well, there are two issues here.

10  One is -- three, really.  One is whether it was, in fact,

11  available on demand; two, whether they actually complied

12  with it, because having a policy that's known to not be

13  complied with is a different issue; but three, it doesn't

14  address at all the internal do-not-call list of the entity

15  on whose behalf the calls are being made here, which is

16  Charter.  This doesn't address the Charter do-not-call

17  policy, as Mr. Link said in his deposition.

18       THE COURT:  What we have, though, is, I think,

19  an undisputed fact that all calls on behalf of Charter are

20  made by Empereon.

21       MR. LARRY:  All calls that were made to

22  Mr. Simmons in this case were made by Empereon.  Were --

23       THE COURT:  Okay, right, and that's what he has

24  standing to raise.

25       MR. LARRY:  Correct.

1          THE COURT:  Right.  And the policy says that any

2    requests will be honored, so if he requests, Don't call

3    me, that will be honored, meaning Empereon won't call him,

4    meaning he will not be called by Charter.

5          MR. LARRY:  I don't know that that last point

6    holds, Your Honor.  We didn't get into any of the issues

7    regarding how Charter chooses which vendor calls which

8    individual.  That was outside the scope of what we were

9    dealing with.  But the --

10          THE COURT:  But can you make an allegation that

11    somebody other than Empereon -- you've had months of

12    discovery already.  Can you make any allegation in an

13    amended complaint that somebody other than Empereon could,

14    might, did call Mr. Simmons?

15          MR. LARRY:  They certainly didn't, but at the

16    time he made his request -- his first request, he was

17    certainly still eligible to be called by Charter and was,

18    in fact, called by Charter.  And this deals with the

19    adequacy of the policy generally in that the policy has a

20    known flaw whereby an individual who requests that a

21    specific marketer stop calling, makes a do-not-call

22    request, won't be removed from Charter's do-not-call --

23    won't be placed on Charter's do-not-call list and will be

24    eligible to be called.

25          THE COURT:  How do you get that?  "Any request

1   will be honored."

2          MR. LARRY:  Because Charter's Rule 30(b)(6)

3   deposition -- designee, Mr. Link, testified -- and I can

4   grab the exact language, page 52 of his deposition --

5   Empereon cannot put them on Charter's list by request.

6   They have to contact Charter directly.

7          So what we have here is their own evidence.  The

8   testimony of their own representative and the evidence

9   they're relying on here are in conflict about what exactly

10  the do-not-call policy is and what ability Empereon has to

11  do anything about it.

12         THE COURT:  Why isn't that a hypothetical issue

13  in this case?  Mr. Simmons was put on the list somehow

14  within the time required.  So whether the policy explains

15  how it happens or not, it happened.  He didn't have to

16  call Charter directly.  He called Empereon, and he got on

17  the list.

18         MR. LARRY:  He got on the list eventually, not

19  during a call that he initiated.  He got called the first

20  time.  He immediately called back.  He made a request not

21  to be called that he initiated.  He requested to not be

22  called any further.

23         THE COURT:  Right.

24         MR. LARRY:  Mr. Link has testified --

25         THE COURT:  Right.

1          MR. LARRY:  -- on Charter's behalf that such

2     requests aren't binding on Charter.  He was then called

3     three more times on Charter's behalf, and finally, when he

4     was able to get the do-not-call request through during an

5     Empereon-initiated call, the request went through, which

6     is, I believe, what Mr. Link accounted for in his

7     deposition.

8          THE COURT:  How is there a problem with the

9     policy, which is what we're talking about?  You're saying

10    this is an inadequate policy.  The policy is anybody who

11    tells us they don't want to be on the list, that request

12    will be honored.  They will be put on the list.

13    Mr. Simmons, by admission, was put on the list.  How can

14    he -- you may have somebody else who has a problem, but

15    how can Simmons raise a complaint about the adequacy of

16    this policy when he was, in fact, put on the do-not-call

17    list, even if Empereon doesn't generally do that?

18          MR. LARRY:  Because he was put on the

19    do-not-call list eventually and only after receiving three

20    more calls.  And what we have here is a situation where

21    the policy didn't apply to the scenario where he called

22    them back up and requested to be put on the do-not-call

23    list.  So the policy, within its own --

24          THE COURT:  The policy does --

25          MR. LARRY:  The scope of the policy didn't

1  cover --

2          THE COURT:  Yes, it does cover it.  Anybody who

3  informs us orally will have the request honored.  It

4  doesn't say anything about we have to call them or they

5  have to call us or whatever.  It says it will be honored.

6  So I don't understand the inadequacy.  And you're stuck,

7  aren't you, with the idea that although he received

8  another call, that was within the period during which

9  they're permitted to change the do-not-call list.  The

10  regs don't say you have to do it instantly.  The regs

11  don't say you can't call somebody after they've requested

12  it, you can't call them if they're on that list, and he

13  was put on the list, and he wasn't called after that.  And

14  he was put on the list within the time permitted.  This is

15  what I don't understand, how Simmons has a claim here.

16          MR. LARRY:  The 30-day period is not a minimum

17  within which anything is permissible.  It's as soon as is

18  practicable.  And as they showed with the request that

19  actually went through, four days was practicable.  If they

20  had processed his initial request within four days, he

21  wouldn't have received any more calls at all.

22          THE COURT:  So your complaint is that they

23  didn't do it within four days, even though they later

24  showed they were capable.  The problem with that argument

25  is you don't know if they did it in response to the second

1    call or the first call, so you don't know whether it was

2    the full period that they needed to effect that or if they

3    effected it within four days.

4              MR. LARRY:  Well, we do, Your Honor, because

5    Empereon testified as to which call was the triggering

6    event for the do-not-call request.

7              THE COURT:  Okay.  So you're imposing a four-day

8    limit, notwithstanding the fact that the regs have a

9    30-day limit?

10             MR. LARRY:  The regulations don't have a 30-day

11   limit.  They have a "in no event longer than 30-day"

12   limit.

13             THE COURT:  Right.

14             MR. LARRY:  As soon as it's practical, and in

15   this case, they've got a system that works quickly and

16   efficiently when it's applied.  And the issue here is

17   their system doesn't apply to a known scenario that occurs

18   and is designed to occur, which is customers calling back

19   to Empereon.

20             The reason Empereon uses a number that is unique

21   to Charter when initiating the outbound calls -- this was

22   discussed in the Empereon deposition -- is so that an

23   individual who receives a number can call Empereon back,

24   and Empereon will know what account that individual was

25   called about, so in this case Charter.  Mr. Simmons was

1   called on a telephone number that was unique to Empereon

2   making Charter calls.

3           THE COURT:  Okay.

4           MR. LARRY:  Mr. Simmons called back.

5           THE COURT:  Right.

6           MR. LARRY:  Mr. Simmons made a do-not-call

7   request.

8           THE COURT:  Right.

9           MR. LARRY:  Per Charter's corporate designee,

10  that request would not be covered by this policy.

11          THE COURT:  By Empereon's policy?

12          MR. LARRY:  Correct.

13          THE COURT:  How does Charter know what's covered

14  by Empereon's policy, and why can't I just read the policy

15  where it says, in all caps, Any requests will be honored?

16          MR. LARRY:  Because if Empereon is making the

17  calls under Charter's direction and on its behalf, then

18  Charter is in charge of how that request -- how the whole

19  system works.  And if Empereon --

20          THE COURT:  Where do you get that from?

21  Empereon has to follow its policy.  It has a policy saying

22  any requests will be honored.

23          MR. LARRY:  And the issue here --

24          THE COURT:  Requests were honored, and he's on

25  the list, and he hasn't been called after he got on the

1  list.

2         MR. LARRY:  One of the requests was honored.

3         THE COURT:  Okay.

4         MR. LARRY:  The first request was not.

5         THE COURT:  The first request -- we don't know,

6  do we?

7         MR. LARRY:  We do.

8         THE COURT:  He's put on the list.

9         MR. LARRY:  We have testimony from --

10        THE COURT:  So what you're going to go back --

11 you're going to say that there is a material issue here

12 about whether he requested to be on the list in that first

13 call; is that it?

14        MR. LARRY:  I think that is a material issue,

15 but I think the bigger issue here is Charter isn't

16 entitled to have any calls -- any telemarketing calls made

17 on its behalf unless it satisfies the conditions in

18 Section 1200(d).  And here they haven't met their burden

19 of showing that's the case, because the one policy they've

20 produced they claim is a do-not-call policy doesn't cover

21 a very specific and recurring do-not-call situation.

22        THE COURT:  So there has to be a hundred percent

23 perfect implementation of a policy or Charter is liable

24 for the error that its agent makes with respect to not

25 honoring a request they're required to honor vis a vis the

1  written policy?

2          MR. LARRY:  No, I think that's the point of the

3  error requirement.  Where I think their policy falls short

4  is that it knowingly doesn't cover a specific factual

5  scenario that they intend to recur.

6          THE COURT:  Wait.  Help me out.  What is it

7  about "any request will be honored, oral or in writing,"

8  that suggests that the policy is inadequate?  You're

9  saying it doesn't cover something.

10          MR. LARRY:  Yes, it doesn't cover addition to

11  Charter's internal do-not-call list.  It talks about

12  Empereon's do-not-call list.  Charter has an internal

13  do-not-call list that indicates who gets called or not.

14          THE COURT:  But they don't maintain their own

15  list.  They don't have to have a policy.  Do they?

16          MR. LARRY:  There is a Charter internal

17  do-not-call list that is managed by PossibleNOW.

18          THE COURT:  Right.

19          MR. LARRY:  There's a separate Empereon

20  do-not-call list that applies to all the other companies

21  that Empereon calls on behalf of.

22          THE COURT:  Okay.

23          MR. LARRY:  The Charter list covers all the

24  other companies that call on behalf of Charter, as well as

25  Empereon.  Empereon, according to Mr. Link, can't add

1  individuals to the Charter list.

2          THE COURT:  How did it happen then?

3          MR. LARRY:  It can't add individuals to the

4  Charter list if they called Empereon, which is a scenario

5  that Empereon has structured its system to allow for,

6  which makes sense.  You want people to be able to call

7  back so that if they have a miscall from your number, you

8  can sell them additional cable or Internet services.

9          THE COURT:  All right, page 52 of the Link

10  deposition that you're relying on, what's the story?

11          MR. LARRY:  What's that?

12          THE COURT:  I'm asking counsel how he responds

13  to your argument.

14          MR. NARESH:  Yes, Your Honor, a few points.

15  I'll address that one first.  What Mr. McRoberts,

16  Empereon's representative, testified -- and this is

17  Exhibit D to our opening motion, page 95 -- page 93:  If a

18  person calls up -- Question:  If a person calls up, they

19  call back to the call-back number that's identified to

20  Empereon's Charter inbound, whatever other appropriate

21  client inbound, that person asks, Put me on your

22  do-not-call list, that is then uploaded to -- that's a

23  Charter inbound call, that's daily batched, sent to

24  PossibleNOW's Charter do-not-call list, as well as

25  Empereon's do-not-call list?

1      Answer:  It goes to the Empereon do-not-call

2  list, and then that list gets updated to Charter once a

3  week.

4      So this whole line of, basically, on this one --

5  and if you read the rest of Mr. Link's deposition

6  transcript on those same pages, pages 52 and 53, it's

7  clear that if you make that request, you don't get a call

8  back from Charter or on behalf of Charter from Empereon or

9  otherwise.  And the record is pretty clear on that.

10      Mr. Larry mentioned one other thing about the

11  availability, and that's also rebutted by the Empereon --

12  Mr. Larry suggests that there's a dispute as to whether or

13  not it was really available on demand, and Your Honor

14  pointed out, I believe correctly, that the policy itself

15  says requests for do-not-call policy, in Section 2, Any

16  customer who requests a copy of the policy is entitled to

17  receive it as soon as possible.

18      And what Mr. McRoberts testified in his

19  deposition at page 95, again, Exhibit D, he's being asked

20  about the process for requesting these policies.  And he

21  says, Question:  Is that the process?  What is that

22  process describing?

23      Answer:  The process is for if we need to send

24  out a do-not-call letter policy, the policy.

25      So if a customer says, Send me a copy of your

1   policy?

2           Yes, correct.

3           And then he talks about you have to fill out a

4   handwritten form.  And then Mr. McRoberts says, I've only

5   done it about five times since 1997.  I've seen five of

6   them.  It's not a common request.

7           So it is available on demand.  It's just that

8   people don't often ask for it.  Mr. Simmons didn't ask for

9   it.  It's just not something people typically do.  But the

10  record is clear and unrebutted that this policy is

11  available on demand upon request if somebody asks for it,

12  just like the regulation calls for.

13          In terms of the compliance point, and Your Honor

14  pointed out, it's kind of a res ipsa point.  He was added

15  to the policy, and that's because, as Mr. McRoberts

16  testified, it's because that's the process.  You get added

17  to the -- you get added to the do-not-call list.

18          But in terms of the language of the regulation,

19  Mr. Larry keeps talking about as soon as practical, but

20  that's not what the regulation says.  The regulation in D3

21  says, specifically:  Persons or entities making calls for

22  telemarketing purposes or on whose behalf such calls are

23  made must honor a residential subscriber's do-not-call

24  request within a reasonable time from the date such

25  request is made.  That period may not exceed 30 days from

1   the date of such request.

2           And maybe I'm reading too fast; I don't see

3   anywhere in the entire regulation the language "as soon as

4   practical."  The idea is you're supposed to do it.  You've

5   got 30 days to do it.  Under our version of the facts, it

6   happened within four days.  Under their version of the

7   facts, it happened within 15 days.  Under either

8   version -- that's why we say it's not a material

9   dispute -- under either version, it happened within either

10  half the time allowed by the regulation or far less than

11  that.  And so in terms of the timing of the compliance, I

12  think the regulation squarely supports us.

13          The other point Mr. Larry raises on *Dynasty*, the

14  *Dynasty* case, which is -- there are actually two *Dynasty*

15  cases.  They're both from the FCC, not binding authority,

16  but one of them is a notice of potential liability, and

17  one is an order that implements it, and the former is the

18  one that talks -- is the only thing that we've seen

19  talking about the written procedures.  And Mr. Larry tries

20  analogizing Exhibit O to the written procedures, but the

21  *Dynasty* -- the written procedure at issue in *Dynasty* was

22  a -- it was a promotional script.  It was a Q and A, with

23  one question and one answer.  And then probably most

24  importantly what the FCC found is that's not good enough.

25  And then the description, which was a description saying,

1   Hey, we'll scrub every seven or eight weeks against the

2   do-not-call list, the FCC said, But that's not what you

3   actually do.  The unrebutted testimony in that record was

4   there was a procedure, but nobody followed it, and that's

5   what drove the FCC's ruling, notice of potential liability

6   in *Dynasty*.

7           The unrebutted testimony in this case is that

8   Charter does, for every single phone call, before a phone

9   call gets made, it gets scrubbed twice before that phone

10  call gets made, every 30 days, which is exactly what the

11  rules require, and so no call goes out without getting

12  that scrub.  That's undisputed.

13          And I think that dovetails into -- and I know

14  that the focus has been on kind of the X's and O's, on the

15  dotting the I's and crossing the T's, but the thrust of

16  the statute itself -- the statute itself doesn't talk

17  about a written policy, doesn't talk about written

18  procedures.  It talks about reasonable practices and

19  procedures -- that's the quote -- that are exercised with

20  due care.  That's the quote.

21          And the idea is, you know, the regulations are

22  kind of setting up a proxy for what that might be, but the

23  point of the -- the point of the statute is to make sure

24  that companies aren't out there willy-nilly making

25  telemarketing calls without regard to what's on the

1  do-not-call list.  And the unrebutted testimony and

2  evidence in the record shows there were ample procedures.

3  I mean, it was done for every single phone call on a

4  rolling basis multiple times, and that it just happened to

5  be that Mr. Simmons and Ms. Simmons got mixed up on the

6  front end.  It's not an issue with the policy itself or

7  the procedures themselves.

8           THE COURT:  Okay.

9           MR. NARESH:  I believe that's what Your Honor

10  asked me to address, but --

11           THE COURT:  Yes, it is.

12           MR. NARESH:  -- I'm happy to stay up here if

13  there are any other questions.

14           THE COURT:  I tell you what, let me get his

15  response.

16           MR. LARRY:  Sure.  Thank you, Your Honor.  So I

17  wanted to address something that Mr. Naresh brought up,

18  both just now and when he was up there previously, the

19  discussion of the error issue, this idea that Mr. Simmons,

20  the other Simmons, simply got mixed up, that it was just

21  some accident that happened.  And I think what's important

22  to realize here, this is a known risk that Charter runs

23  when it's operating this nationwide calling campaign, and

24  the idea that this is a risk -- that this was a mistake,

25  that this wasn't some intentional feature of the process

1   is inaccurate.

2           The way Charter gets phone numbers for customers

3   it no longer has numbers for is a process known as skip

4   tracing.  And skip tracing, as Mr. Link recognized in his

5   deposition, is not an exact science.  And the issue comes

6   up here where Charter doesn't specify -- doesn't have a

7   requirement that the skip trace number be confirmed to be

8   accurate.  It's willing to accept several levels of

9   confidence from the skip trace vendor provider.  Mr. Link

10  wasn't positive about what that number was, and he wasn't

11  positive about what those numbers meant, and so what we

12  have -- but he did recognize that the skip tracing process

13  is inaccurate sometimes.

14          So what we have here isn't a situation where

15  somebody misdialed a number, you know, pressing the wrong

16  button; this isn't a situation where somebody clicked the

17  wrong button; this isn't even a situation where somebody's

18  phone number was accurate until the day before, when it

19  got changed.  This is a situation where Charter rolled the

20  dice knowingly, and it came up on the losing end of it.

21  So the idea that this is an error within the way that that

22  term is used in the regulations is, I think, inaccurate.

23          And looking at the notice of potential

24  liability --

25          THE COURT:  Do you have any authority for that?

1   In other words, skip tracing is a common way to find the

2   phone number for somebody that you don't have it for.  In

3   other words --

4            MR. LARRY:  It's also a common way that these

5   lawsuits get originated, because it's often wrong.  But

6   the bigger issue here is there is some discussion, albeit

7   limited, of what error means, and that's in the notice of

8   potential liability from the FCC, where it says that an

9   error claim should be supported by evidence showing that

10  otherwise unlawful telephone solicitations were made

11  unintentionally and detailing any procedural breakdowns

12  that led to such calls.  This isn't that the call was made

13  unintentionally, and this wasn't a procedural breakdown.

14  This was the nature of the process and --

15           THE COURT:  Why isn't it both?  Why isn't it

16  both of those things?  They were not trying to reach

17  Mr. Simmons.  They were trying to reach Ms. Simmons.  They

18  didn't intentionally call Mr. Simmons.

19           MR. LARRY:  They intentionally called the number

20  that they called, though.

21           THE COURT:  Correct.

22           MR. LARRY:  They took all the actions they

23  intended to take.  There was no action they took that was

24  unintended.  They accepted the number, knowing there was a

25  risk it was inaccurate.  They then dialed, knowing that

1  there was a risk it was inaccurate.

2  THE COURT:  So if they get a message --

3  MR. LARRY:  To call that error, rather than a

4  calculated decision, is inaccurate.

5  THE COURT:  What authority do you have for that

6  suggestion that an error isn't an error -- when they

7  called the wrong person, it's not an error within the

8  meaning of --

9  MR. LARRY:  I'd say to the extent it's an error,

10 it's an error of judgment, and I don't think --

11 THE COURT:  Okay.  You want me to hold as a

12 matter of law it has to be somebody's finger slipped, or

13 somebody wrote down the number incorrectly, or somebody

14 couldn't read the handwriting of somebody else?

15 MR. LARRY:  No, I would -- I would be happy to

16 leave that up to the ultimate finder of fact in the case,

17 so up to a jury as to whether that was an error.  All I

18 would like is for the Court not to enter an order saying

19 that an error includes any situation where a company such

20 as Charter takes a calculated risk and comes out on the

21 wrong end of it.  They knew what they were getting into

22 here.  They made the decision that it's better -- they're

23 better off maximizing the number of outbound telemarketing

24 calls they can make rather than insisting upon absolute

25 certainty or incurring the extra cost of doing so.

1    THE COURT:  They weren't telemarketing

2    Mr. Simmons.

3    MR. LARRY:  The calls were made to sell

4    additional services.

5    THE COURT:  To Ms. Simmons.  Why isn't that an

6    error?  They're trying to reach Ms. Simmons.  They want to

7    market to her.  Why isn't a wrong number an error?

8    MR. LARRY:  They made --

9    THE COURT:  That's the definition of an error,

10   isn't it?  You called somebody, Oops, I got the wrong

11   number.

12   MR. LARRY:  Even if that was the case for the

13   first call, it couldn't have been the case for the second,

14   third and fourth calls.  They made no effort to confirm

15   that that was the correct number, neither during the

16   original call nor the second call, the inbound call.

17   THE COURT:  Did Mr. Simmons say during the first

18   call -- I think it was Sophie, wasn't it? -- Sophie

19   Simmons doesn't live here?

20   MR. LARRY:  No, but the burden is not on him to

21   make sure that the defendant follows the law.

22   THE COURT:  I'm asking about whether the second,

23   third and fourth calls are errors.  They have reason to

24   believe that Ms. Simmons is at that number.  Mr. Simmons

25   has not given them any reason to believe she's not at that

1    number.  Why isn't the second, third and fourth call,

2    therefore, just as much a wrong number error as the first

3    call?

4              MR. LARRY:  I would challenge that they had

5    reason to believe that the number belonged to Ms. Simmons

6    in the first place.  They knew --

7              THE COURT:  They paid somebody to find her

8    number, right?

9              MR. LARRY:  They paid somebody who they knew was

10   not --

11             THE COURT:  Infallible.

12             MR. LARRY:  Correct.

13             THE COURT:  Do they have to be infallible?  Does

14   the skip tracer have to be infallible?

15             MR. LARRY:  No, but they should certainly --

16   Charter in this case should certainly be able to specify a

17   certain degree of confidence in the accuracy of the

18   assessment that is factually reasonable.  And in this case

19   they haven't shown that the required degree of confidence

20   was reasonable.

21             THE COURT:  How do they do that without calling

22   the number?

23             MR. LARRY:  They could specify that only numbers

24   meeting a certain level, a high enough standard or

25   following certain procedures are --

1    THE COURT:  You can't use skip tracing and have

2 that level ever.

3    MR. LARRY:  They can also not call numbers that

4 were skip traced if they're on the do-not-call list.

5    THE COURT:  You're saying -- right, you're

6 saying do not skip trace a number, period.  You're saying

7 it's illegal to skip trace a number.

8    MR. LARRY:  No, I'm saying a situation where a

9 company knowingly accepts a degree of risk that a number

10 is going to be inaccurate, because it's provided by a skip

11 tracer who has said they are not certain about the number,

12 in that situation where the number is on the do-not-call

13 list, I think it's reasonable to say that it's not an

14 error; it's a known risk.  They rolled the dice.  It

15 didn't come up with their number.  That's not an error.

16 It's just how things shake out sometimes.  They made a

17 decision, and they're stuck with it.

18    THE COURT:  I think I can make this left turn

19 without getting hit.  Oops, I got hit.  I took a

20 calculated risk, so it's not an error.

21    MR. LARRY:  I don't think it's an error within

22 the way the statute talks about it.

23    THE COURT:  And how does --

24    MR. LARRY:  The statute is talking about --

25    THE COURT:  -- the statute talk about it?  How

1  does the statute talk about it?

2          MR. LARRY:  The statute -- excuse me, the

3  regulation.  I misspoke there.

4          THE COURT:  Does it say error?

5          MR. LARRY:  It does say error.

6          THE COURT:  Right, okay.  How else does it talk

7  about it?

8          MR. LARRY:  I think within the context, it's

9  clear that "error" means a deviation from the standard

10  process, that the process was in play.

11          THE COURT:  Okay.

12          MR. LARRY:  Or that the process was there, and

13  for some reason the process didn't get followed.

14          THE COURT:  Okay.  Well, the process was find

15  out her number using a skip tracer, which they followed,

16  and it turned out to be inaccurate.  So how is that not an

17  error within the meaning of the regulation?

18          MR. LARRY:  Because they weren't saying, Find us

19  her number.  They were saying, Find us a number that you

20  think with a certain degree of confidence is her number.

21          THE COURT:  What's the difference?

22          MR. LARRY:  The difference is, within the

23  context of the regulation, I think it's fair to say that

24  the statute is talking about errors in the sense of errors

25  in implementing the process.  And this isn't an error in

1    implementing the process.  It's a known aspect of the

2    process.

3         THE COURT:  Right.  There are going to be a

4    certain number of mistakes.  It's not a perfect process.

5    So your view is if a customer changes her phone number,

6    then the company cannot seek to determine her number or

7    they would violate the TCPA?

8         MR. LARRY:  Well, no, I think the FCC has

9    recently addressed that very issue and granted safe harbor

10   for one call.  But, more importantly, I think it's

11   entirely reasonable to say that given the known risks of

12   skip tracing, calling a skip-traced number that is known

13   to be on the National Do-Not-Call Registry is a risk that

14   was accepted and taken.  And there's no dispute on

15   Charter's end that the number was, in fact, on the

16   registry and that --

17        THE COURT:  But if it's a customer, it doesn't

18   matter if the number is on the registry.  They were trying

19   to reach their customer, and so the Do-Not-Call Registry

20   doesn't have an impact.  If they're calling her, it's not

21   a violation of the Do-Not-Call Registry.  So you're

22   assuming in advance that they know they're calling the

23   wrong number.  Otherwise, it's not a violation.

24        MR. LARRY:  No, I'm just saying that the basis

25   for attaching that number to that individual is not

1  sufficient here.

2          THE COURT:  Right, you're saying it's illegal to

3  use skip tracing.

4          MR. LARRY:  No, I'm not saying that.  What I'm

5  saying is that there's no evidence in the record to show

6  that is sufficient in this case.  They weren't able to

7  specify what actions --

8          THE COURT:  But you're not making an argument

9  about this case; you're talking about skip tracing

10  generally.  Oh, there's risks, and it's not infallible,

11  and therefore you can't use it.  You're not saying the

12  manner in which they sought her number in this case was

13  somehow inadequate, and you can prove that although they

14  normally skip trace here, they just flipped a coin and

15  came up with this number, or flipped through a phone book

16  and put their finger down.  That's not what happened here.

17  They went -- they paid somebody to skip trace the number

18  that came up, and it was the wrong number.

19          MR. LARRY:  That is what happened, and what I'm

20  saying here is the burden is on them to show that the call

21  was not made as a result of an error in that process.  And

22  what I'm saying here is the process worked as intended.

23  They called the number that was given to them.  They knew

24  the number was not a certainty attached to that client.

25  It wasn't like the client had provided the number

1    previously.  They were given a number with a confidence

2    interval that -- there's no evidence in the record what

3    the confidence interval was.  There's no evidence in the

4    record as to how Relevate gets these numbers.

5            And what I'm saying is if they're going to claim

6    the benefit under the statute of the defense, and they're

7    going to meet their burden of showing that it's an error,

8    they need to do a lot more than just say, We were wrong,

9    because the knowing acceptance -- we need to know the

10   facts in which they were accepting the risks here.  And

11   Mr. Link didn't know what the confidence interval was in

12   this case.  He didn't know what Relevate did.  So the idea

13   that as a matter of law we can hold that this was the

14   result of an error and a deviation from an otherwise

15   sufficient process is, I think, not the case.

16           THE COURT:  Okay.  Let me ask Mr. Naresh about

17   the statutory safe harbor, 227(c)(5).

18           MR. NARESH:  Yes, Your Honor.

19           THE COURT:  Is that broader in some way than the

20   regulatory (c) and (d) safe harbors?

21           MR. NARESH:  You know, there isn't a lot of case

22   law discussing it.  Our view is that the regulations

23   implement the statute.  And so just as (d) and (c) are

24   intended to implement the reasonable practices, (c) is

25   also intended to implement the statutory safe harbor.

1          THE COURT:  So you're saying that they should

2     be, in effect, consistent?

3          MR. NARESH:  Yes, they should be consistent.

4          If I may address just a few points about the

5     skip tracing as well.

6          THE COURT:  Yes.

7          MR. NARESH:  First, on the error requirement,

8     Mr. Larry said that it's kind of fair to interpret the

9     regulation to say it's an error in implementation, but

10    that's not what the regulation says.  The regulation at

11    (c)(2) Romanette (i) simply says it can demonstrate that

12    the violation is the result of error.  It doesn't talk

13    about error in implementation or deviation from standard

14    practices.  It just says an error.  There is no further

15    gloss on it in the regulation itself.

16         In terms of the skip tracing, I think Your Honor

17    hit it right on the head, there's not -- there's no case

18    that says that skip tracing is illegal.  It's a common

19    method that is used.  If you're trying to reach somebody

20    that you can't reach, you skip trace.

21         And the record shows, and Mr. Larry is saying

22    there was -- there's nothing in the record talking about

23    the degree of confidence, and it's true that Mr. Link

24    couldn't remember the specific confidence level, but he

25    did testify, and we cited this in our reply brief, and

1    it's at Exhibit D of Mr. Larry's response brief:  Do you

2    know what the confidence level is for Relevate?  And

3    Mr. Link didn't know the answer specifically, but he said:

4    It's their top three, I believe, but I shouldn't say that

5    conclusively.  I know we only ask for a top one or two, a

6    maximum of three, from any of our vendors.  We restrict

7    them.

8         Question:  When you say top one or two or three,

9    are you referring to almost levels, something along the

10   lines of certain, almost certain, highly likely or

11   something of that sort?

12        Answer:  That's a fair way to describe it.

13        And so what Mr. Link testified, he said, I don't

14   know exactly what it was, but it was something in the

15   range of certain to almost certain to highly likely,

16   probably something like certain or almost certain.

17        The record also talks about -- and I don't

18   believe it's in this excerpt -- about post-call auditing

19   that's done by Charter to make sure that these are

20   correct.  There's a separate process that Mr. Link

21   testified to where a different company comes in and looks,

22   Hey, did we call anybody on the do-not-call list to make

23   sure that that error rate is either zero or very, very

24   low?  And so it's not that the company is out there kind

25   of willy-nilly calling people saying, Hey, the skip tracer

1  said this is a maybe, let's give it a go and see what

2  happens.  Charter does require a degree of confidence from

3  the vendor and then on the back end tries to bootstrap

4  that to make sure that that vendor is doing a good job and

5  then constantly evaluating those vendors.

6           I think the tell in it is that here we are, you

7  know, many months, eight, nine months after all this, and

8  it's still -- you know, there's no -- plaintiffs haven't

9  come forth with additional examples.  They haven't said,

10  you know, here are other people on the message board

11  saying that they've done -- other people have gotten

12  calls, and they shouldn't have.  This is a needle in the

13  haystack.  This is also why we think no class could ever

14  be certified here, because this is so individualized to

15  Mr. Simmons.  But it is incredibly rare for this kind of

16  thing to happen, but every once in a while it can, and

17  that's the whole point of the error requirement.

18           THE COURT:  Okay, thank you.  Well, let me give

19  either of you a chance, both of you a chance to make

20  whatever further argument you want to make regarding

21  either the motion for summary judgment or what I'll take

22  as an oral motion to amend the complaint.

23           MR. NARESH:  Yes, Your Honor.  I won't repeat

24  all of what we said, and I'll focus more on the latter

25  point.  I believe we covered all the points that I would

1  have covered on the motion itself.

2         But on the motion for leave, I think as the

3  discussion -- the entire part of the discussion for the

4  last half-hour or so, about, has kind of assumed that the

5  vicarious liability had been adequately pled.  I think

6  what that shows is that even if you go that route and

7  grant leave to amend, the summary judgment motion would

8  still be granted because what the record shows is that

9  there were the policies in place, there were these

10  reasonable practices and procedures.

11         So as kind of a procedural -- as a procedural

12  issue of amending, it's been a long time, we've had a lot

13  of discovery, we've had multiple amendments, we've had

14  multiple bites at the apple, but then at the tail end of

15  that, allowing further discovery and further amendment

16  would, in the end, not serve any real purpose for the

17  Court or the parties because the same result would hold,

18  because we'd file the same motion with additional -- maybe

19  there would be some additional discovery, but the facts

20  would still be the same because the requirements of the

21  safe harbor have been satisfied here.  And unless Your

22  Honor has further questions, that's all I have.

23         THE COURT:  All right, thank you.

24         MR. NARESH:  Thank you.

25         MR. LARRY:  May I approach, Your Honor?

1          THE COURT:  Yes, sure.

2          MR. LARRY:  Thank you, Your Honor.  Well, I'd

3   like to start by actually agreeing with something

4   Mr. Naresh said, and that is to the extent -- if the Court

5   is inclined to grant summary judgment as to the policies

6   and procedures, the various safe harbors, we would agree

7   that no amendment would be necessary.

8          But moving on from there as to why we feel like

9   the amendment does make sense, I'm going to try to avoid

10  repeating myself too much here, but Charter's motion

11  didn't attack plaintiff's claims on the basis that we

12  hadn't pled properly the existence of an agency

13  relationship, that no such agency relationship existed,

14  and I think there's good reason for that, which is it's

15  going to be relatively easy to show at the appropriate

16  time.  I just don't think, given the limited discovery

17  schedule that defendant pushed for here, that now is the

18  appropriate time.

19         But moving on to the bigger issues, which are I

20  think those that were addressed --

21         THE COURT:  Let me back up, because you

22  mentioned discovery again.  What have you not discovered

23  that you would need to discover in order to oppose the

24  summary judgment motion, whether it includes vicarious

25  liability or not?

1          MR. LARRY:  I think if the motion were construed

2     as to deal with vicarious liability issues, we would

3     certainly need communications among Charter and its

4     various vendors or other documentary evidence regarding

5     awareness of certain actions, compliance with

6     instructions, things of that nature, the fact-specific

7     inquiries that we would need to set up a vicarious

8     liability situation.  And to be clear, we didn't request

9     those during this discovery period because we didn't feel

10    like they touched on the scope of the issues that

11    defendant insisted upon.

12         THE COURT:  Okay, but what we've got is -- is

13    there any doubt that these entities that are actually

14    doing the work for Charter are doing the work for Charter?

15    I mean, you've known that throughout the scope of

16    discovery, right?

17         MR. LARRY:  That's correct.

18         THE COURT:  And you've obtained from them the

19    documents, such as Exhibit O, the policy of Empereon.

20         MR. LARRY:  That's correct.  There's no doubt

21    that they're in fact doing this on behalf of Charter,

22    generally speaking.

23         THE COURT:  Right, so I guess I'm not following

24    why you need additional discovery to make your argument in

25    opposition to their theory that this -- it would be futile

1  to amend the complaint.

2         MR. LARRY:  I think there are two issues there.

3  One, as to the futility argument, I don't understand their

4  futility argument to be related to the agency issues.  I

5  understand it to be that we shouldn't be allowed to amend

6  to allege agency and vicarious liability facts because, in

7  their view, we're going to lose on the safe harbor

8  provision anyway.  And I actually agree that if we were

9  going to be losing on safe harbor anyway, that that would

10  be -- that there would be no reason for us to amend.

11         And I think we have sufficient facts to, if the

12  Court were to implement such a schedule, move on summary

13  judgment as to agency and make a compelling case.  I don't

14  know what facts they would come back with and what we'd

15  need to oppose any motion from them.

16         THE COURT:  Well, okay, but I don't think they

17  would dispute that these entities were their agents, but

18  how does that help you?  Can you plead in an amended

19  complaint that Empereon violated the statute or regs in

20  some way other than what we've been talking about today?

21         MR. LARRY:  I would have to see how I would

22  phrase everything, but it would deal generally with their

23  acting as a unified entity.  Empereon relying on Charter

24  to maintain its internal do-not-call policy, which is then

25  done through PossibleNOW, isn't able to satisfy the

1   regulations.

2           THE COURT:  Well, okay.  Here's my point.  We

3   went back and forth about this a lot.  Simmons was put on

4   the list.

5           MR. LARRY:  Correct.

6           THE COURT:  Either four days or 15 days after

7   the call when he asked for it, depending on who you

8   believe.

9           MR. LARRY:  Correct.

10          THE COURT:  So I guess I'm not comprehending

11  what it is you need to figure out about what happened.  It

12  happened, in his case.

13          MR. LARRY:  So I may have been unclear, and if I

14  was, I apologize, but I'm not saying that we need further

15  discovery to respond to the specific points in their

16  motion.  I don't think we do.  I think we did that

17  adequately in the briefing.  I realize they disagree.  But

18  I was saying what we need discovery on is to the extent

19  their motion is construed as including a challenge to

20  vicarious liability or should the Court be considering

21  entering that sua sponte, I would say we should be allowed

22  discovery to prove the existence of an agency

23  relationship.

24          But if that's not on the table, I think we do

25  have adequate discovery, and I think the facts are in our

1    favor because, first of all, Charter was not authorized to

2    make telemarketing calls generally because we don't think

3    they had their written policy and procedure publicly

4    available -- or available on demand, excuse me.  And I

5    realize they disagree with that.  Second --

6          THE COURT:  But -- just pause, because what

7    you're saying is when the only entity making a call is an

8    agent, nonetheless the principal needs a separate policy

9    governing the calls it's not making, and the principal

10   cannot rely upon the adequacy of the policy put in place

11   by the agent actually making the call.  Is that your

12   argument?

13         MR. LARRY:  No, it's not.  Again, I'm sorry if I

14   wasn't clear.  The argument is that the agent here,

15   Empereon --

16         THE COURT:  Right.

17         MR. LARRY:  -- its policy did not cover the

18   entirety of internal do-not-call compliance, that based on

19   the way --

20         THE COURT:  How can Simmons care about that?  It

21   covered what he needed it to cover.

22         MR. LARRY:  Because Charter wasn't allowed to

23   make telemarketing calls generally, respective of the fact

24   that he was on the do-not-call list.  The initial call to

25   him was not legal, that because Empereon, the entity

1   making the call, didn't have the entirety of the internal

2   do-not-call policy.  That was maintained by PossibleNOW,

3   another agency that Charter was working with.

4           But the other issue here is it's not limited to

5   just the section -- subsection (d) safe harbor.  Even if

6   they satisfied that, there's still liability under 1200(c)

7   for calling Mr. Simmons when he was on the do-not-call

8   Registry, and that's because there is no viable showing of

9   error here.  Their brief, their opening summary judgment

10  motion, doesn't discuss the error requirement.  It blends

11  over it and tries to lump together (c) and (d) safe

12  harbor, which I think is instructive here because there's

13  no argument that this was done as a result of somebody

14  fudging the dialing process or otherwise making an error

15  in execution.  The error, to the extent there was any, was

16  in designing the calling system in the first place, and I

17  don't think the TCPA, which is designed to prevent calls

18  to people on the do-not-call list, and the regulations

19  should be read to allow for errors in the construction of

20  the policy.

21          THE COURT:  But you have no authority where it

22  has been read the way you think it should be read?

23          MR. LARRY:  I don't think there's much authority

24  going either way.

25          THE COURT:  Right.

1          MR. LARRY:  I think to the extent there is, the

2    FCC's *Dynasty Mortgage* order, the 2005 order, speaks in

3    our favor in that it addresses deviations from adequate

4    policies and a showing that those policies were adequate,

5    and that but for the error, the call -- the unlawful calls

6    wouldn't have occurred.  And here, the error, to the

7    extent there is one, is in allowing for skip tracing of

8    numbers on the Do-Not-Call Registry at a level of

9    certainty that at this point is meaningless.

10          THE COURT:  Meaningless because it turned out to

11   be an error?

12          MR. LARRY:  No, meaningless because the -- their

13   corporate representative didn't know exactly what those

14   confidence levels were, he didn't know what the confidence

15   level of this call was, and he didn't know how those were

16   ascertained.

17          THE COURT:  Okay.  I think that was responded

18   to, but okay.  All right.

19          MR. LARRY:  That's all, Your Honor.  Any further

20   questions?

21          THE COURT:  No.  All right, thank you.

22          I'm going to take this under advisement, and I'm

23   going to treat it, as I said, both as a motion for summary

24   judgment and a motion to amend the amended complaint.  All

25   right, thank you.  We'll stand in recess.

1          (Whereupon, the proceedings were adjourned at

2   2:10 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

I, Sharon L. Masse, RMR, CRR, Official Court Reporter for the United States District Court for the District of Connecticut, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.

April 18, 2016

/S/ Sharon L. Masse
Sharon L. Masse, RMR, CRR
Official Court Reporter
915 Lafayette Boulevard
Bridgeport, Connecticut  06604
Tel: (860)937-4177